G. A. BUDER, Executor of Estate of JACOB STOCKE, SR., v. JACOB STOCKE, JR., ET AL., Appellants.—121 S. W. (2d) 852.

Division One, November 19, 1938.

*Robert W. Hammerstein* and *Rassieur, Kammerer & Rassieur* for appellants.

*Frederick A. Judell* for Pauling Berri and The Salvation Army.

*Salkey & Jones* and *Fred A. Eppenberger* for Central Institute for the Deaf.

*Edgar H. Wayman* and *Louis A. McKeown* for City of St. Louis.

*Cullen, Storckman & Coil* for Jacob Stocke, Jr., and Mabel Stocke.

*Rassieur, Long & Yawitz* and *George Eigel* for Anna Beckmann and Juliette Schroeter.

HYDE, C.—This case, recently reassigned to the writer, is an action of G. A. Buder, executor of the estate of Jacob Stocke, Sr., to construe paragraphs Six and Fourteen of the will of said Jacob Stocke, Sr. All of the legatees and devisees, except the two daughters of the testator who were residuary devisees, have appealed from the decree entered, stating the court's construction of paragraphs Six and Fourteen of this will. Paragraphs Six and Fourteen of said will read as follows:

"Sixth: I also give and bequeath unto my beloved son, Jacob Stocke, Jr., all my holdings of shares of stock in the Progress Press Brick & Machine Company and any and all notes, obligations or claims, which I now hold of said Company, whether evidenced by notes or otherwise due me on open account. . . .

"Fourteenth: In the event the funds on hand at the time of my death are not sufficient to pay off, satisfy, meet and discharge the legacies and bequests herein made, then and in such event I authorize, empower and direct my hereinafter named Executor or Executors, to sell and convey, at public or private sale, the Stocke Farm, located in Survey 2995, situated at the Junction of the Tesson and Green Park Roads, in St. Louis County, Missouri, said tract containing two hundred (200) acres, more or less, lying on either side of the right-of-way of the Missouri Pacific Railroad, which traverses said farm and acreage. The proceeds of any such sale shall be used to pay, meet, satisfy and discharge such legacies and bequests and the balance thereof shall be paid to my Trustees and become part and parcel of the assets of the trust estate hereby created."

In construing said paragraphs of the will it is necessary to notice the provisions of paragraphs Three, Four, Five, Seven and a part of paragraph Eight. Said paragraphs read as follows:

"Third: And I hereby direct my hereinafter named Executor to expend an amount not exceeding Forty Thousand Dollars ($40,-000.00) in the purchase of a suitable lot or tract of ground to be donated to the City of St. Louis for playground, welfare and recreational purposes, such lot or tract of ground to be purchased and deeded to the City of St. Louis as a memorial to myself and to be known and designated as the 'Jacob Stocke Memorial Square,' or otherwise appropriately named and designated, unless I shall have made a conveyance or donation for such purpose or other benevolent and charitable purposes to the City of St. Louis prior to the time of my demise. I request that my Executor confer with my son, Jacob Stocke, Jr., in selecting the district in which such plot of ground shall be located.

"Fourth: I give and bequeath unto my children, Anna Beckmann, Juliette Schroeter, and Jacob Stocke, Jr., and unto my step-children, Sophie Frueh, widow of Henry Frueh, Mary Gerber, wife of Edward Gerber, Katherine Klinger, widow of Adolph Klinger, and to my niece, Pauline Berri, each the sum of Ten Thousand Dollars ($10,000.-00), such legacies to be paid as soon as possible after my death.

"Fifth: In recognition of grateful appreciation of the kindness of my beloved son, Jacob Stocke, Jr., and his wife, Mabel Stocke, in giving up their home at the time of the death of my wife, and maintaining and conducting my household to insure my comfort, welfare and convenience, I hereby give, bequeath and devise unto them my residence and the lot of ground on which the same is situated, located at the northeast corner of Magnolia and Klemm Avenues, known as and numbered 4177 Magnolia Avenue, in the City of St. Louis, Missouri, together with all the household goods and chattels, furni-

ture and fixtures, furnishings and personal effects kept and contained therein or upon said premises.

"Seventh: I give and bequeath unto the Blind Girls' Home, 5235 Page Boulevard, unto the Masonic Home for Crippled Children, known as the Shriner's Hospital, located on Kingshighway Boulevard opposite Forest Park; unto the Central Institute for the Deaf, 818 S. Kingshighway; unto the Teacher's Benevolent Association of St. Louis, Board of Education Building, unto the Salvation Army Rescue Home and Maternity Hospital, 3740 Marine Avenue; unto the South Side Day Nursery, 1621 South Tenth Street; unto 'The Bethesda,' 5651 Vista Avenue; unto the St. Louis Park and Playground Association, City Hall; unto Ransom Post No. 131, G. A. R.; unto 'The Good Fellows,' care of the St. Louis Times, in which I am interested, each of sum of One Thousand Dollars ($1,000.00), being an aggregate of Ten Thousand Dollars ($10,000.00), for such charitable organizations and purposes.

"Eighth: All the rest, residue and remainder of my estate, whether real, personal or mixed property, and of whatsoever kind or character, and wheresoever situate, I give, bequeath and devise unto Oscar E. Buder, A. W. Wenger and G. A. Buder, Jr., as Trustees, for the benefit of my beloved children, Anna Beckmann, wife of Henry C. Beckmann, Juliette Schroeter, wife of William Schroeter, and Jacob Stocke, Jr., in equal shares, share and share alike, for the period and upon the terms and conditions, subject to the reservations, and for the purposes hereinafter stated, in trust, for their respective protection and benefit, as follows, to-wit:

"Each of my said children are hereby given, bequeathed and devised an undivided one-third interest in said trust estate, and at the expiration of said trust period, unless the same be otherwise or sooner terminated, as hereinafter provided, each shall receive her or his respective undivided one-third interest and the same shall be assigned, transferred, conveyed and delivered to my said children, if alive, or unto their respective heirs and assigns forever. The said trust shall continue for a period of ten (10) years from and after the date of my death and at the end of said term of ten (10) years, unless otherwise sooner terminated by agreement, the said trust estate shall be divided among my said children in the proportions set forth as herein provided. The interest, dividends, earnings, rents, income and profits from said trust estate shall be divided among my said children, or their heirs, in the manner and at the times hereinafter provided."

The court's construction of paragraph Six, and the effect thereon of certain facts shown in evidence, was, as follows:

"The Court doth further find and so adjudge and construe provision Sixth of said will that there is no ambiguity, but finds that

the bequests therein to Jacob Stocke, Jr., of shares of stock in the Progress Press Brick & Machine Company and all notes and obligations of said Company then held by the Testator, had been adeemed by reason of the valid forfeiture of the charter of said Company by the State in 1921, and by acts of the testator subsequent to the making of the will inconsistent with said provision; that there was a radical change in the conditions pertaining to the business of the Company and in the relations of the testator and his son as to their interests in said Company and its assets, and their obligations for its liabilities that followed; that said forfeiture became known to Jacob Stocke, Jr., in either 1921, 1923 or 1924, according to his own testimony, but that such forfeiture did not become known to the father until about 1928, at which time the testator and his son, Jacob Stocke, Jr., were sued as partners by the Schroeter Coal Company on a company obligation; that the partnership relation created by the forfeiture was on the basis of their holdings of stock, to-wit: 499/500ths by Jacob Stocke, the testator, and 1/500th by his son, Jacob Stocke, Jr., and was continued to the time the father was declared *non compos mentis* in September, 1929, and subsequently to the date of his decease; that by reason thereof, under the evidence and the applicable law, the son is estopped from asserting, as he does, that he is entitled to the assets of the business, chiefly real estate, just as he would have been titled to the stock, etc., under paragraph Sixth, had the company continued to live and operate, as was the case when the will was made. That the acts of his son, Jacob Stocke, Jr., including the deeds executed by him, as established by the evidence, estops him from the successful assertion of such a claim, and that hence the property formerly belonging to the Progress Company on hand at the time of his death, chiefly real estate, passes to the residuary estate under Clause Eighth of the will of said deceased.''

The testator died in July, 1931, at the age of eighty-seven. He had been adjudged *non compos* in September, 1929, and remained under guardianship until his death. The guardian's appraisement showed a total value of more than a half million dollars. The guardians were Jacob Stocke, Jr., and George Eigel, who was attorney for the testator's daughters and was appointed co-guardian to represent their interests. The testator's will was executed June 28, 1926. Jacob Stocke, Jr., was sixty-one years old at the time of the trial. As a boy, he worked with his father in his fruit and vegetable business at the Union Market. When he was about eighteen, his father bought an interest in the Tower Grove Brick Works, and put him to work there. When he was twenty-one, he was put in charge of the plant. The business was later incorporated as the Progress Press Brick and Machine Company, and was thereafter operated under that name until after the testator was declared incompetent. The testator had

continued his business at the Union Market, for about fifteen years after he bought the Brick Works, and in connection therewith operated a truck farm in St. Louis County. During that time Jacob Stocke, Jr., was in charge of the Brick Company. Later the testator's son-in-law, Henry Beckmann, obtained a substantial interest in the Brick Company, and for several years the stockholders and the board of directors were Beckmann, Jacob Stocke, Jr., and the testator. Jacob Stocke, Jr., held only one share to qualify him as a director. Beckmann owned 180 shares. No formal directors' meetings were held, and no minutes were kept of any meetings of directors or stockholders.

The charter of the Brick Company was declared forfeited on January 1, 1921, by the Secretary of State under the provisions of Section 4619, Revised Statutes 1929 (Sec. 9813, R. S. 1919), and no application for recision under Section 4621, Revised Statutes 1929 (Sec. 9815, R. S. 1919) was ever made. Jacob Stocke, Jr., testified that he knew of the forfeiture within a year or two after it was declared. He also said that his father knew of it within that time, but there is other evidence tending to show that he did not know of it until after his will was executed. Mr. G. A. Buder, who drew his will, did not know of it at the time. Some friction had developed between Beckmann and Jacob Stocke, Jr., which finally resulted in a suit by Beckmann against the Brick Company in 1924. This suit was settled by testator in April, 1926, for $45,000. By this settlement, the testator became the owner of Beckmann's shares, and Beckmann also conveyed some land used by the Brick Company to the Arkmoreland Realty Company, a corporation, in which the testator owned all the stock except qualifying shares for directors. Thereafter the testator owned 499 of the 500 shares of the company. The settlement was made partly in cash and partly in notes, at least $22,500 was paid on these notes during the guardianship, and a $13,000 note remained unpaid at the testator's death. There were 250 shares of Arkmoreland Realty Company stock pledged to secure its payment. Mr. Buder was attorney for the testator in this suit and made the settlement believing that the Brick Company was a corporation in good standing. His first information to the contrary was when the Schroeter Coal Company brought suit on a Brick Company account in 1928 against the testator and Jacob Stocke as partners. The Brick Company was, at all times after 1921 and up to the guardianship, operated under the same name and in the same manner as it had been prior to the forfeiture of the corporate charter.

It is contended that the shares of stock in said corporation which were bequeathed to Jacob Stocke, Jr., by clause Six of the will were not in existence on the date the will became effective, and he could take nothing thereunder, because the corporation's charter

had been forfeited and its assets delivered to testator during his lifetime. The court's decree was based on this theory, holding that there were no shares of stock in existence after 1921 upon which the will could operate; that the business was thereafter operated as a partnership; and that the bequest of the shares of stock by clause Six of the will was therefore adeemed. Before considering the effect of what occurred after 1921 upon the legacy given in paragraph Six, it is necessary to determine its meaning and effect. We do not agree that it is a clear and unambiguous bequest of only stock and notes of a corporation. By this paragraph, the testator not only gives to Jacob Stocke, Jr., "all my holdings of shares of stock in the Progress Press Brick & Machine Company" but also gives him "any and all notes, obligations or claims, which I now hold of said Company, whether evidenced by notes or otherwise due me on open account." It does not describe this company as a corporation. After he bought out Beckmann, the testator was actually the sole owner of the Brick Company whether his holdings therein be considered on the basis of corporate stock or individual ownership of the property, regardless of whether it was a corporation, a partnership, or an individual business. The single share held by Jacob Stocke, Jr., was only to qualify him as a director, and after the Beckmann settlement there were not enough stockholders to have a board of directors. [Sec. 4941, R. S. 1929.] The language of this paragraph seems broad enough to pass the entire interest of the testator, originally represented by shares of corporate stock, in this brick business, including all property held, used and considered by him as a part of it, and every claim he could have against it, by agreement or by operation of law, regardless of whether it was a corporation, a partnership, or an individual business. Can there be any doubt that this was the intent of the testator? He had, only two months before he made this will, paid $45,000 to the Beckmanns on the theory that the transfer of their shares of stock passed to him their entire interest in and claims against the business and its property, real and personal. Certainly it did pass the equitable title thereto. [See 14 C. J. 62, sec. 26.] Surely then the language of paragraph Six was intended by him to mean that his entire interest therein, whatever it was, should go to his son. This intent is corroborated by and in fact is, we think, the only reasonable inference to be drawn from all surrounding circumstances. He put his son in this business when he was only eighteen. He made him manager of it when he came of age. Jacob Stocke, Jr., had been the manager in full charge for more than thirty-five years when the will was made. At that time the testator had just repurchased the only interest he had ever parted with therein, because it had become apparent that his son and son-in-law could not operate the business together in harmony. He had actually then

become the sole owner of the business whatever its character was. He had always furnished whatever funds were required above the income of the business to meet its obligations. The inventory of his estate shows a $32,500 note of the Brick Company dated December 2, 1913, signed by him as president and H. C. Beckmann as secretary. He was on the best of terms with his son and his son's wife, because he chose them to live with him, keep house for him, and take care of him, when his second wife died shortly before he made this will. In recognition of this he gave to them jointly, by another paragraph of this will, the residence in which they lived with him. If we gave paragraph Six any other construction than that above stated, we would clearly be disregarding the rule of law, stated in numerous opinions and established by statute (Sec. 567, R. S. 1929) to construe a will according to ''the true intent and meaning of the testator.'' We so construe it.

Thus construing paragraph Six, we consider the question of whether there was an ademption, of the specific bequest therein made, by reason of anything done by the testator prior to the guardianship. ''Ademption is the term used to describe the act by which a testator, by payment or gift during his lifetime, confers on a legatee the benefit (Woerner, sec. 446, says this is satisfaction rather than ademption) which he had proposed to give by will at his death under a general or demonstrative legacy; or else (which is the principle claimed to be applicable to this case) the act by which a specific legacy has become inoperative on account of the withdrawal or *disappearance of its subject matter from the testator's estate* during his lifetime. (Our italics.) . . . Ademption is, it has been said, merely one of the ways in which a legacy lapses; it is the extinction or withholding of a legacy in consequence of some act of the testator . . . some act equivalent to revocation or indicative of an intent to revoke.'' [69 C. J. p. 998, sec. 2199; see, also, 28 R. C. L. 344, sec. 338; 63 A. L. R. 639, note; 97 A. L. R. 1033, note; 3 Woerner on Administration 1523, sec. 446; Wickliffe v. Wickliffe, 206 Mo. App. 42, 226 S. W. 1035; Lamkin v. Kaiser (Mo. App.), 256 S. W. 558; see, also, Graham v. Karr, 331 Mo. 1157, 55 S. W. (2d) 995.] Acts or events which would work the ademption of a specific legacy therefore occur, if at all, after the will is made. Thus it is clear that there is no ademption in this case by reason of the forfeiture of the Brick Company's charter, or the operation of the business thereafter prior to the guardianship. The forfeiture of the charter by the Secretary of State, which the court held to work an ademption of the bequest of the stock, occurred long before the will was made, since the corporation's charter forfeited by order of the Secretary of State on January 1, 1921, and the will was made on June 28, 1926. Nor could mere continuance of the business, with-

out any liquidation of the corporation, be an ademption. Wherever the effect of the forfeiture, the equitable title to all original corporate property, at least after payment of debts, belonging to the stockholders, and the transfer of the title to the shares certainly would carry with it the right in equity to the interest in the corporate property represented thereby. [See 14A C. J. 1152-1154, secs. 3806-3808; 13 Am. Jur. 1197, sec. 1352; see, also, 13 A. L. R. 173, note; 40 A. L. R. 558, note.] How could there be any issue here of ademption by change in the condition or character of the Brick Company, after the will and prior to guardianship, when the continuance of this business from 1926 (date of the will) to 1929 (date of the guardianship) was on no different basis than was its continuance from 1921 to 1926? Except for the fact that the testator held the interest represented by Beckmann's shares, the situation was the same. If the business was a partnership from 1926 to 1929, it was a partnership from 1921 to 1926. If it was the testator's individual business before he made the will (when he bought out Beckmann) it continued to be his individual business thereafter. We hold that there was no ademption, or revocation of paragraph Six, by anything done by the testator prior to the commencement of the guardianship.

The next question is: Was there an ademption by reason of what was done during the guardianship? The weight of authority, with which the decisions in this State agree, is against holding that an ademption has resulted, from the dealings of a guardian of an insane or incompetent testator with his ward's property, where the physical facts make it possible to hold otherwise. [69 C. J. 1003, sec. 2202; 3 Woerner on Administration 1524, sec. 446; 30 A. L. R. 676, note, discussing both American and English cases; Lamkin v. Kaiser (Mo. App.), 256 S. W. 558; National Board of C. W. B. v. Fry, 293 Mo. 399, 239 S. W. 519.] Of course where the bequeathed specific property and everything received for it has completely disappeared from the testator's estate before his death, there could be no other result reached except an ademption or revocation by complete failure of the bequest or devise; as, for example, a sale of the bequeathed property by the guardian and expenditure of the proceeds for the maintenance of his ward. [See Macfarlane v. Macfarlane, 47 Scot. L. R. 266, 1 Scot. L. T. (1910) 40; National Board v. Fry, supra.] That is not the case here. There is no question about the identity of the property, real or personal, owned by the Brick Company. It was separately inventoried both by the guardians and by the executor. The identity of the real estate, to which the Brick Company had title, and that it is now a part of the testator's estate, is conceded. Therefore, there can be no complete failure here by reason of an entire disappearance of the property covered by

the will, and everything received for it, from the testator's estate prior to his death.

The reasons for holding against an ademption by changes due to a guardian's dealings with property (which fit the situation in this case exactly) were well stated in Re Estate of Henrietta Cooper (N. J.), 123 Atl. 45, 30 A. L. R. 673, as follows:

"A committee in lunacy is a mere conservator of his ward's estate, and his possession of that estate vests him with no power, either intentionally or unintentionally, to change his ward's duly expressed purposes respecting the disposition of her estate after her death. To hold otherwise would be to say that *he may arbitrarily revoke her will*, so far as it provides specific legacies, *and may transfer the property which is the subject thereof from the persons designated by the testatrix to the residuary legatee*, or—if there be none—to the next of kin." (Our italics.)

Likewise, the United States Circuit Court of Appeals, Seventh Circuit, clearly summarized this matter in Wilmerton v. Wilmerton, 100 C. C. A. 366, 176 Fed. 896, 28 L. R. A. (N. S.) 401, certiorari denied 217 U. S. 606, 54 L. Ed. 900, 30 Sup. Ct. 696, as follows:

"We think that the rule that legacies are deemed only where such an intention appears on the part of the testator himself, ought to be followed. The question, in our judgment, is not whether, as a mere matter of accident, or of purpose outside of the testator's purpose, the thing set apart as the corpus of a special bequest has been changed in specie. The real question is whether, all things considered, the testator's testamentary disposition did, or did not, remain, with reference to the particular thing embodied in the specific bequest or its proceeds, the same as it was the last moment he was able to exercise a testamentary disposition. In that way, and in that way only, we think, can the right of the man to dispose of his property according to his own wishes, exempt from the interference, caprice, or interest of others, be fully carried out."

In this case, the guardians liquidated the Brick Company by placing the title to its real estate in the testator (by deeds from Jacob Stocke, Jr., and Beckmann as members of the last board of directors, and personally, as well as by correction deeds from grantors to the company); and by selling all its personal property (the largest item being brick on hand which sold for $23,097.87) for a total sum of $35,559.33, according to the guardians' first settlement. Some items of personal property, with an inventory value of several thousand dollars, were not sold and were delivered to the executor on final settlement of the guardianship. The guardians also paid all debts of the Brick Company which were more than the amount received from the sale of its personal property. Their first settlement shows under "Disbursements—Brickyard" a total of $76,314.61. It is contended

that the payment out of the remaining personal estate of the testator of more than $40,000 excess of Brick Company debts over the amount received for its assets shows that it was insolvent to such an extent that the bequest made in paragraph Sixth was actually of no value. That is, it is claimed that the liabilities of the Brick Company, to persons other than the testator, exceeded the value of its assets so that what was paid out of the guardianship estate for debts was equal to or greater than the value of the assets which that estate received from the Brick Company, which resulted in no actual increase of value to it. However, we find included, in these disbursements, payments to the Beckmanns totaling $27,648. The evidence tends to show that these were payments on the testator's personal obligation to them, assumed by him before he was incompetent, under the settlement through which he obtained their stock and, therefore, were not debts properly chargeable to the Brick Company either in the liquidation or under the will. This reduces the difference on the first settlement to $13,171.28, which was approximately the amount of general and special taxes paid on the Company real estate during that period of the guardianship. Therefore the result of the guardians' dealings with the property disposed of in paragraph Six was to place the legal title to the real estate in the testator, where the equitable title then was; to pay the debts, including real estate taxes, of the Brick Company (due to third parties) out of proceeds derived from the sale of its personal property, and to the extent of about $13,000 excess out of the other personal estate of the testator; and to leave in existence unpaid the note of the Brick Company held by the testator. Except *pro tanto* as to property sold and used to pay debts, we hold that there was no ademption, or revocation of paragraph Six, because of the guardians' liquidation of the Brick Company; and that the real estate originally owned by the Brick Company passes under the will to Jacob Stocke, Jr., as well as any of its remaining personal property.

It is further contended that Jacob Stocke, Jr., is estopped to claim this land under the will because of his acts during the guardianship. We do not think there is any merit in this contention because neither he nor his co-guardian had any knowledge of the contents of the will and whatever they did could not, therefore, be held to have been the assumption of a position, either intentionally or negligently, contrary to Jacob Stocke's right to claim what the will gave him. Since none of the other beneficiaries knew the contents of the will either, it is difficult to see how they could have been misled or induced to change their own position with respect to it in reliance thereon, and they did not do so. Moreover, the co-guardian was the attorney for the other two principal beneficiaries, the testator's daughters, so that what the guardians did was really

with their advice and consent. Furthermore, Jacob Stocke conducted a brick business of his own continuously from the time the guardians liquidated the old company, buying part of the brick sold in the liquidation to do so. His refusal to pay rent for the Brick Company land, which he used in connection therewith, was a position in accord with what the testator intended by paragraph Six. Placing the legal title of the original corporate property in the testator, during the guardianship, where the equitable title then was, certainly was no detriment to the other beneficiaries, and was only a recognition of the actual situation.

It is argued that other beneficiaries were prejudiced because the $32,500 note of the Brick Company held by the testator was not paid out of the Brick Company assets. This could not be true because the testator clearly intended that this note should go to Jacob Stocke, Jr. It is likewise argued that the other beneficiaries were prejudiced by the dismissal, during the guardianship, of the claim of the Arkmoreland Company for rent of its land used by the Brick Company on the theory that all property belonged to the testator. However, almost all of the buildings, used by the Brick Company, were built by it on Arkmoreland real estate and became Arkmoreland's property upon the liquidation of the brick business by the guardians. It does not appear from the record that the Arkmoreland Company got the worst of this transaction. Certainly the fact that the guardianship cost $20,000 ought not to affect the rights of Jacob Stocke, Jr., under the will, even if liquidation of the brick business greatly increased the expense. This was as much the act of one guardian as the other (in fact the sisters' representative insisted on it) and both got the same allowances. We hold against the contention of an estoppel.

Nevertheless, Jacob Stocke, Jr., should not be entitled to get more than he would have received had there been no liquidation and payment of the Brick Company debts, by the guardians, or to profit at the expense of the residuary trust estate by what he did as guardian. That there was an excess appears from conceded facts, which are a part of his own case, and are the facts upon which his claim is based. Apparently the excess paid in the liquidation was about equal to the amount of real estate taxes paid by the guardians, which Jacob Stocke, Jr., would of course have been required to pay had the will become effective in 1929 when the guardianship began. Therefore, the amount of this excess (over the amount the guardians received from Brick Company assets) paid out of the remaining personal estate of the testator, during the guardianship, to pay debts, including taxes, of the Brick Company, other than those specifically assumed voluntarily by the testator prior to the guardianship (which would not be chargeable against the property because given to Ja-

cob Stocke, Jr., by paragraph Six) should be determined by an accounting. This amount should be charged against the land as a lien to be discharged by Jacob Stocke, Jr., upon payment to the executor of the amount thus fixed by the court. Since this case only involves consideration of the situation that existed at the death of the testator, such matters as whether the Arkmoreland Company can collect any rent thereafter from Jacob Stocke, Jr., and what equalizations can be made upon distribution as to any amounts paid for taxes on the Brick Company land by the executor, will have to be determined in other proceedings.

■ The remaining question herein is the correctness of the court's construction of paragraph Fourteen, as to which all the defendants (legatees given definite amounts by the will) except the testator's children, have appealed. The court's construction was, as follows:

"The Court doth further find, in construing said clauses of the will of Jacob Stocke, aforesaid, that it was the intention of the testator to make the legacies set forth in paragraph First, Third, Fourth and Seventh payable primarily out of the cash in his estate at his death, and that cash was what the testator meant by the use of the words 'funds' in paragraph Fourteenth, and if there was not enough cash then said legacies to be made up and paid out of the proceeds of the sale of the Stocke Farm described in said paragraph Fourteenth and not otherwise. That the evidence showed that the testator valued said farm at not less than Two Hundred Thousand Dollars ($200,000.00) and believed that sum would be more than ample to pay legacies mentioned above and leave a surplus for the residuary estate which was placed in trust. That the legacies under clauses First, Third, Fourth and Seventh are general legacies payable out of cash and that in the event the cash on hand, together with the proceeds realized in the sale of the Stocke Farm, be not sufficient to pay the same in full, that the same be pro-rated among the legatees thereunder according to the amounts provided for therein by the testator, with the exception of the legacy of Ten Thousand Dollars ($10,000.00) to Mary Gerber, mentioned in Clause Fourth, which the Court doth find had lapsed, the said Mary Gerber having predeceased the testator leaving no child or children, or descendants of any child or children, surviving her, and excepting the One Thousand ($1,000.00) to the Ransom Post, which has already been paid; further, that it was the intent of the Testator that if the cash on hand and the proceeds realized from the sale of the Stocke Farm did not fully discharge said legacies, that to the extent they are unsatisfied they should fail."

The character of these legacies must be determined from "the intent of the testator, as gathered from the entire will." [Fidelity National Bank & Trust Co. v. Hovey, 319 Mo. 192, 5 S. W. (2d) 437.]

While we agree with most of the construction and finding of the court stated in the first two sentences above quoted, we do not see how we can sustain its construction that pro-rates, among the legatees given fixed amounts, only the amount of the cash on hand at the testator's death "together with the proceeds realized in the sale of the Stocke farm," and declares that these legacies "should fail" to the extent they are unsatisfied thereby. The will gives these legatees (except city of St. Louis under paragraph Third where amount is left to the executors' discretion within the maximum stated) definite and fixed sums in separate paragraphs. There is no direction in any of these paragraphs giving any of these legacies that they are to be paid out of any particular fund or property, or as to how they are to be paid, or that they are not to be paid in full in any event. Therefore, without paragraph Fourteen they would clearly be general legacies. [69 C. J. 921, sec. 2086; 28 R. C. L. 291, sec. 264; 3 Woerner on Administration 1511, sec. 444.] Paragraph Fourteen does not specifically limit the payment of these legacies given by preceding paragraphs to funds derived from these two sources. Neither does it say these legacies are not to be paid in full. On the contrary, it does indicate an intent that they be paid in full because it shows that the testator believed that the farm could be sold for a price which with cash on hand would be more than enough to pay them. It is also significant that the testator did expect to receive a substantial amount of money soon after he made this will, from his deceased wife's estate, and that about $49,000 was received therefrom by the guardians.

The evidence tends to show that the value of the farm at the time the will was executed was greater than the total amount of all legacies. Its location was about nine miles from the main business section of St. Louis. The evidence also shows that none of the testator's children ever farmed or were interested in farming, as he was, which explains why he directed it to be sold to provide money to pay legacies rather than his other assets which consisted almost entirely of corporation stocks. The most valuable of these were stocks of two real estate holding companies (the real estate owned by these companies was all in the city of St. Louis) of which he owned all shares, except directors' qualifying shares. The value of these shares was based on city real estate values and all of his children lived in the city. However, he had other stocks which were valuable at the time he made his will, but which later became worthless. No doubt the testator reasonably believed, on the basis of 1926 values, not only that all of his shares in these two personal holding companies would go into the testamentary trust created in paragraph Eight (he had previously created an *inter vivos* trust with 900 shares of the Arkmoreland Company, the largest of these companies, for his three

children), but also that this testamentary trust would be further increased by an excess of proceeds derived from the sale of his farm after payment of all debts and legacies. However, the failure of real estate and other values, to remain at such levels as to accomplish this, does not change the testator's clearly expressed direction and intent that the fixed and definite amounts bequeathed to each legatee be paid to them. These changes in values took place after 1929 and while he was under guardianship. We hold that the most that can be said about paragraph Fourteen is that it points out a primary fund for the payment of these legacies, but does not make this the exclusive means of payment or change the intention shown by all the rest of the will that the legatees be paid at all events, and that this makes them demonstrative legacies. The fund out of which this paragraph makes them primarily payable is cash on hand (which includes deposits in banks) at the testator's death (which he could not reasonably have been expected to be alone sufficient) and the proceeds realized from the sale of the farm. However, a demonstrative legacy is payable out of general assets if the primary fund designated fails in whole or in part. [69 C. J. 922, sec. 2087, 28 R. C. L. 292; sec. 266, 3 Woerner 1513, sec. 444; 6 A. L. R. 1353, 1389; 73 A. L. R. 1250, 1256; Kenaday v. Sinnott, 179 U. S. 606, 21 Sup. Ct. 233, 45 L. Ed. 339.] Therefore, if the proceeds of the sale of the farm are insufficient to pay legacies in full, then it is the duty of the executor to convert to cash sufficient general assets to pay them.

The decree is reversed and the cause remanded with directions to take an accounting as herein directed for the purpose of establishing the amount to be charged as a lien on the land passing under the will to Jacob Stocke, Jr., and to thereafter enter a new final decree in accordance with the construction of the will herein stated. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.