F. W. Diebold and Wm. L. LeGrand, Executors of the Will of Frank L. Diebold, Deceased, Respondents, v. Peter L. Diebold, Mary L. LeGrand, Louisa Dohogne, Clara Essner, Leo Diebold, Chester Dohogne, Sylvester Dohogne, Gilbert Dohogne, Gloria Maxine Dohogne and Albert James Dohogne, Respondents, Joseph C. Diebold, Anton Diebold, and Christina Ressel, Appellants.—141 S. W. (2d) 119.

Springfield Court of Appeals. May 21, 1940.

84

*J. Grant Frye* for appellants.

*Stephen Barton* for executors.

*Ray B. Lucas* for Chester Dohogne, Sylvester Dohogne and Gilbert Dohogne.

I.

TATLOW, P. J.—The said executors of Frank L. Diebold brought this suit in the Scott County Circuit Court to have the will of the said Frank L. Diebold construed. The case was appealed to the Supreme Court, and by that court certified to this court.

There is no dispute as to the facts. The case was tried upon admissions made by both plaintiffs and defendants in open court, as shown by the bill of exceptions.

Only three of the children, who were three of the devisees or legatees, appealed from the decree: Joseph C. Diebold, Anton Diebold and Christina Ressel, who are entitled to three-tenths of the estate, subject to charges with interest at the date of the trial, as follows: Joseph C. Diebold, $977 and interest; Anton Diebold, $2503 and interest; and Christina Ressel, $4209 and interest.

But two questions are presented for decision:

First, whether the executors under the will have any authority to sell real estate except upon order of the Probate Court, for the purpose of paying debts and legacies.

Second, whether the indebtedness of John Dohogne, in the principal sum of $1200, which, with interest at the date of the trial, aggregated $1802, should, under the terms of the fourth clause of the will, be charged against the descendants of the deceased daughter of the testator.

John Dohogne is the widower of Agnes Dohogne and the father of their four children, viz., Charley Dohogne, Chester Dohogne, Sylvester Dohogne and Gilbert Dohogne. John Dohogne married Agnes Diebold about 1905. He is still living and has not remarried. Agnes Dohogne died February 19, 1913. The notes of John Dohogne sought to be charged against the interest of her children (including Charley Dohogne who died before the testator leaving two children) were executed, one on November 30, 1925, for $1000, and one on March 14, 1927, for $200.

The will is dated the 15th day of November, 1928. The testator died on November 16, 1934. The will, omitting the attestation clause and the certificate of the witnesses, is as follows:

"Last Will

"In the name of God Amen:

"I Frank L. Diebold of Benton, Scott County, Missouri, being of sound mind and disposing memory do make and declare the following to be my last will and testament:

"First: It is my desire that all my just debts be paid includeing my Funeral expenses.

"Second: I will and bequeath One Thousand Dollars to the Roman Catholic Church to be used for the erection of a new Church Building for the St. Dionisious Parish at Benton, Scott County, Missouri.

"Third: I will and bequeath to my children all of my Property Real and Personal remaining after the forgoing *bequeths* are fulfilled and the execution of this will is paid, to-wit:

"To my son, F. W. Diebold, One Tenth Part.

"To My Son, Peter L. Diebold, One Tenth Part.

"To my Daughter, Mary A. LeGrand, *ne*: Diebold, One Tenth Part.

"To my Daughter, Louisa Dohogne, nee: Diebold. One Tenth Part.

"To my Daughter, Clara Essner, *ne*: Diebold. One Tenth Part.

"To my Son, Joseph C. Diebold, One Tenth Part.

"To my Son, Anton Diebold, One Tenth Part.

"To my Daughter, Christina Ressel, nee: Diebold, One Tenth Part.

"To my Son, Leo Diebold, One Tenth Part.

"To the *desendants* of my Daughter Agnes Dohogne, *ne*: Diebold deceased, One Tenth Part to-wit:

"To Charley Dohogne, One Fort*y*eth Part.

"To Chester Dohogne, One Fort*y*eth Part.

"To Sylvester Dohogne, One Fort*y*eth Part.

"To Gilbert Dohogne, One Fort*y*eth Part.

"Fourth: I direct that all Notes that I have, or have paid for an*ey* of my sons, or son-in-laws where their respective name appears at the head, or as Princip*le* of the Note, Said Note or Notes shall be charged against him or his Wife as the cause may be, for the full amount due on, or Paid on the respective Note with 6 per cent Interest from the time said notes were paid by me and have so remained unpaid to me, but no Compoun*t* Interest shall be charged.

"Fifth. It is my will that my Executors hereinafter named Shall make disposition of the Personal Property within One year after my Death. But no time limits shall govern the Executors to disposition of the Real-estate but they Shall have the privilege to use their own Judgment as to the best o*p*ertune time to dispose of said Real-estate for the benefit of the Benefactors, and the Signature of the Executors to the Deed shall make the sale of said Real-estate Legal when acknowl*ag*ed.

"Sixth: I hereby appoint my Son F. W. Diebold and my Son-in-law Wm. L. LeGrand Executors of this my last will and Testament, without Bond, and without compensation to themsel*fs*."

The decree contains the following finding:

"The court further finds that at the death of the said Frank L. Diebold, he had notes in his possession on which he had advanced or loaned to, or paid for John Dohogne and certain sons and sons-in-law, where their respective names appear at the head or as principal of said notes, as follows: (Listing twenty-two notes)."

In deciding the first question the trial court held that the testator, by his last will and testament, "did thereby, empower his executors to sell the real estate belonging to him at the date of his death for the purpose of making distribution of his estate among his heirs, dis-

tributees and legatees as described in his will; that said executors have power and authority under said will to sell the said real estate and convey title thereto by executor's deed or deeds, duly signed and acknowledged by them and make distribution of the proceeds of such sale or sales in conformity with the provisions of said will and the construction thereof as herein found and construed.''

In deciding the second question the trial court held that the testator did not intend to and did not bequeath to the descendants of Agnes and John Dohogne their interest subject to the said notes of John Dohogne, for the reason that, at the time the notes were made, at the time the will was executed, and at the time of the death of the testator, John Dohogne was no longer the son-in-law of the deceased for the reason that John Dohogne's wife (and the deceased's daughter) died in 1913. The notes sought to be charged against the respective interests at the time of the trial, with interest, are as follows:

"John Dohogne owed .............................$1802.00
"John Ressel and Christina Ressel owed ..............$4209.00
"Leo Dohogne and Louisa Dohogne owed ..........$6084.00
"P. L. Diebold owed ............................$3947.80
"Anton Diebold owed ...........................$2503.00
"F. W. Diebold owed ...........................$1650.00
"William LeGrand owed ..........................$ 762.00
"Joe C. Diebold owed ..........................$ 977.00''

According to the inventory there were ten pieces of real estate, only one of which exceeded eighty acres. The total value of the real estate, according to the inventory, was $10,550. The home tract of 193.85 acres was under-valued approximately $3000. There was a $1500 mortgage on some of the real estate, which made the readjusted value of the real estate $12,050.

The bill of exceptions contains the following, with reference to the value of the personal property:

"That the original inventory filed in the estate, in addition to the real estate and its appraised value, next above set out, shows notes totaling, exclusive of interest, $16,475.64; cash, $460; other personal property, less $749 held as collateral, later released, $756; that the notes listed in the inventory which are admitted worthless other than the notes of the heirs and devisees or their husbands and wives, total $1636.

"That the inventory filed by the appraisers in the estate of F. L. Diebold shows the appraisers listed the notes of John Dohogne, John and Christina Ressel, Leo and Louisa Dohogne, P. L. Diebold, and Anton Diebold, as doubtful.''

## II.

The solution of the first question requires a construction of the fifth clause of the will.

The appellants' contention with reference to the construction of this clause is as follows:

"The third paragraph of the will makes an outright devise in fee simple in fractional parts to the various devisees and the grant in the third paragraph is absolute, unequivocal and unqualified. Unless there are words in the fifth paragraph of the will equally unequivocal, absolute, and unqualified, the court will not lend its hand to cut down the estate and rights already granted in the third paragraph of the will by the ambiguous, uncertain, and conjectural language in the fifth paragraph."

Appellants cite in support of this rule a long list of Missouri cases, including Sevier v. Woodson, 205 Mo. 202, 104 S. W. 1, where the rule, as contended for by the appellants, is clearly announced. It is also announced in the very recent case of McMurry v. McMurry, 340 Mo. 1094, 104 S. W. (2d) 345. There is no possible doubt as to the existence of this rule, but we do not think it has any application to the solution of the question of whether the will confers upon the executors the power and duty to sell the real estate. That it confers the power to sell the real estate is, it seems to us, quite plain. As to whether it places the absolute duty upon the executors to do so, so as to constitute an equitable conversion of the real estate into personal property, is not *quite* so plain. The rule contended for by the appellants, in our judgment, has no application, for the very simple reason that, whether there is or is not an equitable conversion of the real estate, the interest or estate of the appellants is not cut down by the fifth clause of the will. Whether the beneficiaries under the will get the title to the real estate as such, or the proceeds from the sale of the real estate, in either event, they get an absolute and unconditional estate which is not diminished or cut down by either the power or the duty to sell the real estate. The amount realized from the sale of the real estate is the exact equivalent of the real estate itself; they are equal to each other and are the same thing.

We do not think there is any possible doubt but what the fifth clause of the will confers on the executors, by necessary implication, the power to sell the real estate. Neither do we think there is any serious question but that, when the fifth clause of the will is read in the light of the will as a whole and the extraneous undisputed facts as to the condition of the estate (especially with reference to the number of charges to be made against the respective interests) it not only confers the power to sell the real estate, but places upon the executors an absolute duty to do so in order to execute the will. It would seem to leave no discretion in the executors with reference to the performance of this duty. The most serious objection to this construction is that there is no positive or express direction to the executors to sell the real estate; but this is not absolutely necessary under the controlling decisions of our Supreme Court. The case

of Griffith v. Witten, 252 Mo. 627, 161 S. W. 708, directly holds that there was a conversion of the real estate, even though there were no express words authorizing or directing the executors to sell it. The provision of the will there was:

". . . And the farm In Davis County Missouri to Be Rented For the term of 2 years to give time to Be sold and the Grundy County Land to Be Rented for 2 years to give Time to Be Sold . . ." [l. c. 634.]

The will also directed the sale of the personal property, as does the will in the instant case, and it was held that there was sufficient to constitute a conversion of the real estate, the court saying:

". . . Why talk about selling the land at all, if there was no purpose to dispose of the land by the will? We are not even driven to the principle which usually accompanies wills, i. e., that it is presumed in the construction of wills that the testator intended to dispose of his entire estate. [Tebow v. Dougherty, 205 Mo. l. c. 321, and cases cited therein.] In the instrument before us, awkwardly, drawn as it is, we have clearly expressed ideas of disposing of the entire estate, and for the purpose, as expressed in the will, 'to save trubel and Expence.' The spelling and capitalization may be bad, but the ideas are good." [l. c. 643.]

The will in the instant case does not, as did the will in that case, imply that the real estate was to be sold for the express purpose of saving trouble and expense, but it does imply that the real estate was to be sold so as to charge against the respective beneficiaries the various notes specified in the will. These charges cannot be made against the various interests unless the real estate is sold by the executors or in a partition suit; so the question narrows down to whether the real estate is to be sold by the executors under the terms of the will, or in a partition suit, and the notes charged against the respective interests of the parties.

It is somewhat doubtful if the notes could be charged against the respective interests of the parties in a partition suit. The notes could not be strictly treated as advancements, for the reason that advancements are strictly statutory and the statute applies only in case of intestacy. [Gibson v. Johnson, 331 Mo. 1198, 56 S. W. (2d) 783.] If they could not be, it is self-evident that they could be so charged only by the sale of the real estate by the executors under the will. We will asume that they could have been so charged in a partition suit and, on this assumption, we will consider the question from this angle.

The Kansas City Court of Appeals, in the case of Hull v. McCracken, 53 S. W. (2d) 405, l. c. 406, directly deals with this question, as follows:

"The question as to whether or not it is to the best interest of the devisees that the sheriff of Callaway county sell the real estate under

decree for partition or that the executor sell it in the manner provided in the will was for the testatrix and not for the court. She chose to direct that the executor and not the sheriff sell the real estate and the court will not determine whether she chose wisely or unwisely, but will enforce her intention in that respect as expressed in her will.''

The only difference between that case and the instant case is that, in that case, there was an express direction to sell; but this fact is not sufficient to distinguish the case because in the Griffith case, *supra*, there were no express words authorizing or directing the executors to sell, yet it was directly held that the will in that case constituted an equitable conversion. The fifth clause of the will in the instant case, in express terms, confers upon the executors the duty to use their own judgment as to the best opportunity to dispose of the real estate, which clearly implies the power to sell and shows that the testator had confidence in the executors he selected, and constitutes a reason for the conclusion that the testator thought it was to the best interests of the beneficiaries of his estate that his real estate be sold by his executors in the exercise of a sound discretion as to the time of sale, instead of at a forced sale in partition at the whim or caprice of one or more of his children, who had a very small, or no, interest in his estate (such as in the case of the appellants). A one-tenth interest in the estate amounts to approximately $2800. The charge against the appellant Christina Ressel's interest is $4209 so that she in fact has no interest. The charge against Anton Diebold is $2503, so his interest is about $300. The charge against J. C. Diebold is $977; hence he is the only one of the appellants who has a very substantial interest.

The wisdom of having the real estate sold by the executors, who should exercise a sound judgment as to the most opportune time to do so, instead of having it sold at a forced sale, at the time of the death of the testator in 1934 (during the Depression), would seem to us to be quite evident. We think that the trial court was clearly justified in holding that the will conferred the power of sale upon the executors for the purpose of distributing the estate. If so, it necessarily converted the real estate into personal property, as they could only distribute personal property and not real estate. It is the duty of the executors to sell the real estate and distribute the proceeds and the appellants are not entitled to have the estate settled without disposing of the real estate.

We think the Griffith case, *supra*, is decisive of the instant case as to the power and duty of the executors to sell the real estate. It has never been overruled but has been followed in the case of Ganahl v. Ganahl, 323 Mo. 620, l. c. 629, 19 S. W. (2d) 898, l. c. 901, where the rule is announced as follows:

". . . In order to effect an equitable conversion of real estate into personalty by will, there must be either (1) a positive direction to sell; or (2) an absolute necessity to sell in order to execute the will; or (3) such a blending of real and personal estate by the testator in his will as to manifest his intention, expressly or plainly implied, to create from blended realty and personalty a fund for the purpose of distribution. [Llewellyn v. Llewellyn, 122 Mo. App. 467, 99 S. W. 809; 2 Story's Eq. Jur. (14 Ed.), sec. 1091; Marr's Estate, 240 Pa. St. 38; 13 C. J. 862, 863.]"

The instant case is brought squarely within the rule that there is "an absolute necessity to sell in order to execute the will." This is perfectly apparent, as appears from reading the will itself and the undisputed facts with reference to the notes sought to be charged against the respective interests.

Some of the notes in which the testator is the payee were barred when the will was made, a still larger number were barred at the time of the death of the deceased, and substantially all of them were barred when the suit was filed on February 3, 1937.

The testator was not the payee in a number of the notes, but signed them as surety. The cause of action of his executors is not based on the notes themselves but on an implied promise which the law raises that the principal will reimburse the surety for the payment of the note, and to which the five year Statute of Limitations applies. [Krebs v. Bezler, 338 Mo. 365, 89 S. W. (2d) 935.] The testator was the payee in only seven of the twenty-two notes. With a few exceptions his causes of action for the payments of the notes were all barred at the time of his death.

We do not think that the executors could have sued and obtained judgment on the notes, in view of the fact that the will treats them only as charges against the respective interests of the beneficiaries. We are not required to decide this question and do not do so. It was agreed that the executors had not tried to collect any of the notes sought to be charged against the respective interests of the parties.

The provision of the fifth clause of the will directing the executors to dispose of the "personal property" within one year after the testator's death, has reference to the tangible property instead of the intangible property such as notes, which, if they constitute an asset of the estate, it is the duty of the executors to collect rather than to sell. The executors no doubt construed the will as not requiring them to sue on the notes with a view to their collection because most of the notes were barred at the time of the death of the testator and the will makes them only charges against his estate. It is extremely doubtful if they could have recovered judgment on them if they had sued. Hence, it seems to us to be perfectly apparent that, in order to charge the notes against the respective beneficiaries, it

was absolutely necessary for the executors to sell the real estate. We do not see how there is any possible escape from this conclusion. There is such a blending of real and personal estate in and by the testator's will as to mainfest his implied intention to create from the blending a fund for the purpose of distribution after the charges were made against the respective interests, according to the rule announced in the Ganahl case, *supra.* In our opinion, the only objections that can be urged against the correctness of the conclusion that there was a conversion of the real estate, are purely technical:

First, that there is no express direction to the executors to sell the real estate. This, under the authorities *supra,* is not absolutely necessary in order to work a conversion.

Second, that there is no grant of the estate to the executors. This, too, has been directly decided by our Supreme Court in the case of Wyatt v. Stillman Institute, 303 Mo. 94, 260 S. W. 73, as being unnecessary.

It is our opinion that the fifth clause of the will, by necessary implication, requires and places upon the executors the duty to sell the real estate for the purpose of making distribution thereof, and that the only discretion lodged in the executors is with reference to the time when the real estate could be advantageously sold so that the interests of the beneficiaries of the estate would best be served thereby. This could only have been made plainer if the will had made a direct grant to the executors and an express and positive direction to sell the real estate and distribute the proceeds of the sale; neither of which, under the Missouri authorities, is absolutely necessary in order to convert the real estate into personal property for the purpose of distribution. It is an elementary and well-established rule that whatever is necessarily implied in a written instrument is as much a part of the instrument as if it were plainly expressed therein. This rule applies with particular force to a will, especially where it is conceded that the draftsman of the will was not a lawyer, but a justice of the peace.

## III.

With reference to the second question for decision, the parties have somewhat shifted their position. The appellants, as to this question, invoke the rule that the intention of the testator should govern and that the intention should be ascertained from the four corners of the will. The executors made a like contention in the trial court but did not appeal from the decree with reference to this question. The counsel for the descendants of Agnes Dohogne invoked the same rule that the appellants rely on with reference to the first question. He formulates the rule as follows:

"When the words of a will at the outset fairly indicate testator's disposition to give an interest, or to give the use and benefit of an

estate absolutely to the first donee, such intention will be cut down only by subsequent provisions which are equally clear.''

He further contends that John Dohogne is not included in the fourth clause of the will for the reason that ''A son-in-law is the husband of one's daughter. When the daughter dies, the relationship of son-in-law ceases. Therefore, John Dohogne was not a son-in-law of the testator, either at the time the debt was made or at the time the will was written. [Bouvier's Law Dictionary; Webster's New International Dictionary; Allen v. Cunningham, 143 Tenn. 11, 223 S. W. 450.]''

The dictionaries *supra* so define the term. They do not purport to deal with the effect of the death of the daughter as to whether it does or does not sever the relationship.

The Tennessee case of Allen v. Cunningham, *supra,* relied upon by counsel for the descendants of Agnes Dohogne, deceased, is not in point because, in that case, *there were no children of the marriage.* It does announce the rule that the relationship had been severed by the death of the daughter of Mrs. Allen, to whom the certificate was issued. That was an accurate statement of the rule as applied to the facts of that case. In support of the rule, the opinion quotes from Corpus Juris, as follows:

''In Corpus Juris, vol. 2, p. 379, it is said: 'Death of the spouse terminates the relationship by affinity.' ''

Turning to Corpus Juris, vol. 2, title ''Affinity,'' we find that the Tennessee court did not quote the entire rule as there laid down. It is as follows:

''Death of the spouse terminates the relationship by affinity; if, however, the marriage has resulted in issue who are still living, the relationship by affinity continues.''

The Tennessee court evidently did not quote the entire rule for the reason that, in that case, there was no issue of the marriage. If there had been, the court would no doubt have followed the rule as laid down in Corpus Juris, *supra,* which it cited and approved.

The ancient common law rule was laid down by no less authority than Lord Coke, as follows: ''That the marriage must continue or issue be had to continue the affinity.'' [Coke 157 a.] The rule thus stated, so far as we have been able to ascertain, has been universally recognized in every case where there was issue of the marriage in existence at the time the question arose as to whether the relationship was severed or continued. It has been directly held that, if the marriage has resulted in issue still living, the relationship by affinity continues. [Stringfellow v. State, 61 S. W. 719, 42 Tex. Cr. 538; Bigelow v. Sprague, 140 Mass. 425, 5 N. E. 144, l. c. 146; Jaques v. The Commonwealth, 10 Grat. 690.]

In the Massachusetts case *supra,* in an opinion rendered by Judge HOLMES, afterward Associate Justice HOLMES of the Supreme Court of the United States, it is said:

". . . It appeared that an uncle of Sprague married an aunt of the juror, and that two uncles of the juror married aunts of Sprague, but that each of these màrriages had been dissolved by the death of one of the parties, and it did not appear that there was issue of any of them living. . . ."

In the Virginia case, *supra,* it was directly held:

". . . if the deceased wife left no issue, it is for the prosecution to show the fact; and that fact not being shown, the objection is valid."

So far as our investigation has gone, in every case where it was held that the death of one of the spouses severed the relationship, it did not appear that there was living issue of the marriage. The question of relationship has usually arisen in a criminal case on an objection to a juror because of his relationship to one of the parties involved. The relationship undoubtedly continues notwithstanding the death of the wife, where, as in the instant case, the will is dealing directly with the issue of the marriage, and dealing with them as a class whose rights are derived through their deceased mother. The will in the instant case makes no distinction between the debts of the daughter and of the son-in-law. It deals with them on the principle and theory of the common law—that they are but one person. It deals with the children and descendants of Agnes Dohogne as deriving their rights through her and standing in her shoes. They are entitled to no more nor less than she would have received if living. If she were living the debts that her husband, John Dohogne, owed to the deceased on account of money that the deceased loaned to or paid for him as his surety, would have been charged against the one-tenth interest that she would have received. Her descendants stand in her shoes and are in no better position than she would have stood. They are not dealt with as separate distinct individuals, but their rights are derived directly through her, and not otherwise.

No case has been called to our attention, nor have we been able to find one, in which it is held that the death of the wife, leaving issue of the marriage, terminates the affinity between her widower and her parents. Under such circumstances, the death of the wife does not do so in the construction of a will dealing with the interest of the children of the deceased wife where the division of the estate is based on its equal distribution between the children of the testator, including the deceased as well as the living children. The dominant and controlling thought in such a will is the equal distribution of the estate and not the technical relationship between the testator and the widower of his deceased daughter. The statute would seem to make this quite plain.

"All courts and others concerned in the execution of last wills shall have due regard to the directions of the will, and the true intent and meaning of the testator, in all matters brought before them." [Sec. 567, R. S. 1929.]

The Missouri decisions announcing this rule are too numerous to be cited. A few of them are as follows: O'Day .v. O'Day, 193 Mo. 62, 1. c. 89, 91 S. W. 921, 1. c. 927; Sevier v. Woodson, 205 Mo. 202, 104 S. W. 1; Buder v. Stocke, 343 Mo. 506, 121 S. W. (2d) 852; Bates v. Bates, 343 Mo. 1013, 124 S. W. (2d) 1117; Masterson v. Masterson, 130 S. W. (2d) 629.

In addition to the equal distribution as the central idea of the will, the following facts appear:

1. The estate, including real and personal property, is divided into ten equal parts, based on the number of the testator's children.

2. The charges against each of the ten shares are in the *nature* of advancements rather than debts that constitute an asset of his estate. This is shown by the fact that a number of the notes were barred by the Statute of Limitations as obligations due the estate.

3. That they were not treated by the testator as debts is shown by the fact that he only charged simple interest at the rate of six per cent, even though some of the notes bore interest at a higher rate, and called for compound interest, as in the case of the notes of John Dohogne. The agreed amounts of the various notes, as shown in the bill of exceptions, including the Dohogne notes, shows that the testator never collected any interest on them during his lifetime but treated them as advancements out of his estate.

Reading the will as a whole and in the light of the agreed facts, the statute *supra,* and the Missouri decisions, we think it is quite plain that the one-tenth interest which the descendants of Agnes Dohogne are entitled to receive, is to be charged with the advancements made to John Dohogne under the fourth clause of the will. While it is not necessary for us to decide the question, we doubt that they can be treated as loans made by the testator to John Dohogne as a stranger to the testator, or which he purchased in the ordinary course of business, or which he paid as John Dohogne's surety; we think, and so hold, that they were treated by him as were the advances made to his children. It was the relationship created by the marriage of his deceased daughter, and the fact that John Dohogne was the father of the children who succeeded to the daughter's interest that induced the testator to make them in the nature of advances, but in the form of debts.

It will be noticed that the testator took the assignment of the $1,000 note on the 21st day of May, 1928, which was five months before the will was made, and from that time until his death, in November, 1934, he collected no interest on the notes, but permitted his cause of action on the $1,000 note, in which he was the surety for

John Dohogne, to be barred by the Statute of Limitations. All of which, we think, shows that the testator recognized and treated John Dohogne as his son-in-law within the meaning of the fourth clause of his will, which he had a legal right to do even if it be true, as a legal conclusion, that John Dohogne was not technically his son-in-law.

### IV.

We think the decree of the trial court should be modified so as to find and decree that the said Frank L. Diebold, by his last will and testament, intended to and did bequeath to the descendants of Agnes Diebold a one-tenth share of the estate, subject to the notes aforesaid of John Dohogne as set forth in the finding and decree, which notes are signed by the said John Dohogne at the head or as principal, or paid by and assigned to him, and in accordance with the notations, charges and credits on each note at the date of the death of said testator as to the respective amounts due him at his death on each note, with six per cent simple interest thereon as provided in said will. The interest on said notes of John Dohogne, as well as on the notes made charges against the interests of the respective parties by the finding and decree, should be computed only up to the date of the death of the testator, and, when the said findings and the decree are so modified, the decree should be and is hereby affirmed.

The appeal in the instant case has resulted in increasing in a substantial sum the interests of the appellants and other beneficiaries in the will except the descendants of Agnes Dohogne, and hence the costs of this appeal should be paid out of the assets of the estate, to be taxed, on proper application by the appellants, under the rules of this court. It is so ordered. *Fulbright* and *Smith, JJ.,* concur.