# Staunton.

## TURNER v. DAWSON & ALS.

OCTOBER 8TH, 1885.

1. REALTY—*Sale for partition—Proceeds.*—Where court of equity causes land to be sold for partition, it leaves it to the party entitled to the proceeds, to designate whether he will hold them as personalty, or as realty. And when, for any reason, that party is incapable of making such designation, the court will hold them subject to all the incidents of realty.

2. IDEM—*Case at bar.*—D.'s land was sold for partition, in suit for that purpose. One-third of proceeds was set apart for widow. D.'s daughter, A. was of age, unmarried, and a party to the suit, and afterwards married T., and, without having had issue, died in widow's lifetime. After widow's death, T. sued to recover share of A., his deceased wife, in the third—claiming it had been converted into personalty. There was no evidence that A., whilst *sui juris*, ever elected, or that any·election for her in her lifetime, whilst she was *non sui juris*, had been made, that said third should be personalty.

HELD :

    1. Said third of proceeds of sale in D.'s land is realty.
    2. A.'s share passes to her next of kin.
    3. Her widower has no interest in it.

Argued at Richmond, and decided at Staunton.

Appeal from decree of circuit court of Albemarle county, rendered May 15th, 1883, in the chancery cause under the style of Andrew J. Dawson *against* B. H. Dawson and others. From this decree Peter P. Turner obtained an appeal to this court.

Opinion states the case.

    VOL. LXXX—106

*Watson & Perkins*, for the appellant.

*Thomas S. Martin* and *Duke & Duke*, for the appellees.

RICHARDSON, J., delivered the opinion of the court.

Benjamin Dawson died intestate in the year 1853, leaving a widow and children, and, at the time of his death seized of a tract of about 100 acres of land in the county of Albemarle with a mill thereon. All of the children of the decedent except one, an infant, were adults and *sui juris.*

In the same year of the intestate's death one of the adult heirs, Andrew J. Dawson, filed his bill against Agnes C. Dawson and the other heirs for partition of the real estate by sale. On the 22d day of October, 1853, a decree was rendered in the cause, holding "that the real estate in the bill mentioned cannot be conveniently partitioned among the heirs at law of the said Benjamin Dawson, deceased, and their interests would be promoted by the sale thereof," and decreed a sale thereof, for the purpose of partition. The land was sold under that decree, and the sale was confirmed on the 27th day of October, 1853, for near $8000. Of the proceeds of the sale, $2610.60 was set apart for the widow, the interest on which she accepted and enjoyed during her life in lieu of her dower, and said principal sum is now under the control of the court; and the interest therein of one of the heirs, Agnes C. Dawson, who afterwards intermarried with the appellant, Turner, is the subject of controversy in this suit.

At the time of the sale of said real estate, Agnes C. Dawson was over twenty-one years of age and unmarried. She was married to the appellant on the 8th day of November, 1855, and died in October, 1878, leaving her mother, the dower tenant, surviving her, and without ever having borne a child; and leaving also surviving her, the said Peter P. Turner, her husband, who claims that the $2610.60, now under the control of

the court, was, by the sale of said hand, converted from realty into personalty, and that his wife's share therein passes to him; whilst the next of kin of Mrs. Turner claim that, for the purpose of distribution, said sum still bears the impress of realty, and that Mrs. Turner's share therein passes to them. This is the sole question in the case.

The widow of Benjamin Dawson having died in January, 1882, at the May term, 1882, of the court below, the appellant, Turner, filed his petition in said suit of Andrew J. Dawson *against* B. H. Dawson and others, asking that the share of his deceased wife, the, said Agnes, in said fund, it being the one-fifth part thereof, as well as a certain legacy of $100 which had been bequeathed to his said wife by her sister, Mrs. Thurmond, out of *her* share of the said dower fund, might be paid to him as the administrator and sole distributee of his wife. On the 15th day of May, 1883, the cause came on and was heard by the circuit court of Albemarle county, when a decree was therein pronounced by said court holding that the next of kin of Mrs. Turner were entitled to her share to the exclusion of the said Peter P. Turner. From that decree the case is here on appeal.

The precise question here involved has never been decided by this court. It must therefore be considered upon principle and by analogy to kindred propositions adjudicated in this state and elsewhere.

In the eye of the common law the ownership of land has ever been regarded with a peculiar sacredness not incident to the ownership of mere personalty. "Upon the introduction of the feudal law into *England*, all lands became holden, either by a free tenure, or in villenage. The tenant who held by a free tenure had always a right to the enjoyment of the land for his life at least, and could not be dispossessed, even for the non-payment of his rent, or the non-performance of his services; whereas, the tenant who held in villenage, might be turned out at pleasure by his lord, and his possession, being

perfectly precarious, was considered to be the possession of his lord, to whom he was, in a great degree, a mere slave. The person thus holding land by a free tenure, was, therefore, called a *freeholder*, because he might maintain his possession against his lord: and for this reason, *liberum tenementum* or *freeholder* was opposed to villenage." 1 Lomax Digest, 4. And the acquisition of an estate of freehold was attended with certain valuable rights and privileges. The freeholder became a member of the county court, one of the *pares curiæ* in the Court Baron, or Lord's Court, was entitled to be summoned on juries in the King's Court, and to vote at the election of a knight of the shire. So "estates of freehold" are either estates of inheritance, or estates not of inheritance. Freehold estates of inheritance are divided into inheritances absolute or fee simple, and inheritances limited. Of the former quality and quantity of estate, in land, Benjamin Dawson was seized at his death, and dying intestate, the estate so held by him descended to his heirs at law unfettered.

Moreover, with the full establishment of the feudal system in England, all lands were, by universal acknowledgment, held mediately or immediately of the king; and thus, not only privileges and dignities become incident to the ownership of land, but the great feudal lords, as well as their tenants and retainers, were erected into a powerful military system, founded upon the idea of permanent interest in and attachment to the soil.

In this connection, too, may be mentioned the English law of entail, evidencing the fixed purpose of the English people to make permanent the tenure of real estate. Hence, it was well remarked in argument, by counsel for the appellees, that it is a prominent characteristic of English civilization for land to go with the blood of him who acquires the right of property therein. Perpetuities are repugnant to our institutions, and hence estates tail were abolished, in Virginia, as early as 1785; but, in a modified form, so far as consistent with our institutions, we can yet trace, in our laws respecting real estate, many

of the ancient landmarks, attesting the attachment which our people have to the idea that land should run with the blood. This is strongly exemplified by the course of descents prescribed by our statute, ch. 119, § 1, by the tenth and last clause of which it is declared: "If there be no father, mother, brother, or sister, nor any descendant of either, nor any paternal kindred, the whole shall go to the maternal kindred; and if there be no maternal kindred, the whole shall go to the paternal kindred. If there be neither maternal nor paternal kindred, the whole shall go to the husband or wife of the intestate; or if the husband or wife be dead, to his or her kindred, in the like course as if such husband or wife had survived the intestate and died entitled to the estate." Thus, it is only in the last resort that land passes by descent from or to husband or wife. All this is in recognition of the right of blood on the side from which the land comes.

From what has been said, very naturally comes the well recognized equitable doctrine, that money agreed or directed to be laid out in the purchase of land, is considered in equity as land, because there, whatever is agreed to be done is considered as actually done. Where money, directed to be laid out in the purchase of land, comes into the hands of the person who would have had the absolute property of the land, in case a purchase had been made, it will be considered as money, and may be claimed accordingly. But when it is in the hands of a third person, some act must be done by the person entitled to it to show that he considers it as money, otherwise it will still be deemed land. See 1 Lomax Dig. 2, and authorities cited.

The last branch of the doctrine above stated is appropriate to the case in hand, and was recognized and applied by this court in the case of *Ashby* v. *Smith and wife*, 1 Rob. R. 59. In that case the testator, an inhabitant of Frederick county, Virginia, directed by his will that the tract of land on which he lived be sold by his executors, at such time and upon such terms as they might think would be best for his heirs; that the

proceeds be applied to the purchase of other lands upon the most advantageous terms, either in the state of Kentucky, or some other part of the western country, that his executors might think would be most to the general interests of his heirs; and that the lands so purchased should be divided amongst his five daughters and two sons—each of his daughters to have four hundred acres, and the residue to be equally divided between the two sons; all of which divisions he desired should bear an equal proportion to each other in respect to the quality of the land. The testator appointed his wife executrix, and one of his sons executor. The son qualified as executor a few months after the testator's death, and the widow died about two years afterwards. The husband of one of the daughters purchased the right of another daughter, and the three other daughters sold their rights to the son who was executor. In 1816, ten years after the testator's death, the husband and wife filed a bill to compel the executor to execute the trust by selling the lands and distributing the proceeds. In 1827, a supplemental bill was filed, setting forth that in 1817 a sale was made, but the executor had taken no further step towards executing the trust; and praying that the plaintiffs might have a decree for their proportion of the proceeds of sale. The executor answered, that he had always been ready to purchase land in the western country for the complainants. It was held on appeal,—1. That, as the trustee had improperly delayed the execution of the trust, until a great change had taken place in the situation of the western country, and the circumstances of the parties, the beneficiaries ought not then to be compelled to take lands in the western country, but should be allowed to take their just proportion of the money arising from the sale of the Frederick lands; and that the principle of equity in the division of the said money is in this case just and proper. 2. That the female complainant's portion of the money arising from the sale of the lands should be so secured and protected, as to prevent its being subjected to the control or

debts of the husband to a greater extent than if it were land, unless the wife should consent that the money be paid to the husband absolutely; as to which she ought to be privily examined, separately and apart from her husband, in the same manner as in the conveyance of her real estate. In delivering the opinion in that case, Judge Cabell said: "This court therefore approves of the decree of the chancellor in establishing the right of the beneficiaries to elect to take money instead of land, and in directing an equal division of the fund among the parties. But the decree is defective in not having so secured and protected Mrs. Smith's portion of the money arising from the sale of the Frederick lands, as to prevent its being subjected to the control or debts of the husband to a greater extent than if it were land; in which case, the husband would be only entitled to the profits during the coverture, or for his own life as tenant by the curtesy, in case he survived the wife, having had a child by her, born alive; for this money, being in lieu of land to which the wife was entitled, ought to be regarded as land, and treated accordingly, unless indeed the wife should consent that the money should be paid to the husband absolutely, as to which she ought to be privily examined, separately and apart from her husband, in the same manner as in the conveyance of her real estate."

It is obvious that, upon principle, the above remark of Judge Cabell completely meets and refutes every point taken in favor of the appellant's claim in this case. In that case, as in this, the land had been sold and money taken in lieu thereof. The money thus held represented, in that case, land devised by the testator to be sold and the proceeds reinvested in other lands for the devisees; and the trustees having for many years neglected to execute the trust, and having at last sold the land devised to be sold, after bill filed to compel the execution of the trust, and after the changed condition of the parties and circumstances rendered a strict compliance with the testator's directions not only impracticable, but inequitable, the court, upon

equitable principles, interposed for the best interests of the devisees, considered and treated the money thus held by the executor as land, and, upon the principle that equality is equity, decreed a distribution accordingly. But the court below having neglected to secure the distributive share of Mrs. Smith, a *feme covert*, against the control and debts of her husband, this court, in that respect, reversed the decree of the court below, holding that the interest of the *feme covert* devisee was in the nature of and must be treated as land, and that her rights in respect thereto must be protected. accordingly, unless relinquished by her in the mode prescribed by statute for the conveyance of the real estate of a married woman.

For precisely the same reason, though under somewhat different circumstances, not affecting the application of the principle involved, the fund in dispute here must be considered and treated as *land*. Benjamin Dawson died intestate, seized of *land*, and Agnes Dawson inherited *land*. The land thus inherited by Agnes and the other heirs was not susceptible of partition in kind, and for that reason alone one of the heirs (not Agnes,) brought suit for partition by sale, as the only way in which *partition* could be effected. The cause having been regularly matured, and *depositions taken* (of course to establish the fact that the land was not susceptible of partition in kind), the court decreed the land to be sold for the purpose of partition. The land brought about $8000; of this sum, $2610.60 was set apart, the interest on which the widow took for life, in lieu of her dower. The widow was the survivor of her said daughter Agnes by several years. Agnes was *sui juris* when the land was sold. She did not marry for some four years after the sale. For the whole of that period she was capable of so doing, and might have disposed of her share or interest,—as well in the sum set apart for dower purposes (though she could not demand her interest therein until her mother's [the widow's] death), as of her interest over and above the fund set apart for dower purposes. But she did no act during the time she thus re-

mained *sole*, which changed the character of her inheritance—especially as to her interest in the dower fund now in controversy. During that period there seems to have been a partial distribution of the proceeds of the land, Agnes receiving her portion of the partial distribution. She was *sui juris*, and could by her act treat the amount so received as to her seemed best. After her marriage with the appellant, there seems to have been a further distribution, a decree in the cause showing that the money thus distributed was directed to be paid to the appellant, Turner, and his wife, the said Agnes. These sums were no part of the dower fund, but were the interests of Agnes over and above that. And as to the sum directed to be paid to her husband and her, after her marriage and during coverture, it is clear, upon the doctrine laid down in *Ashby* v. *Smith, supra,* that it could not be paid to Turner, the husband, unless by her consent, ascertained by privy examination, as required in the case of a conveyance of her real estate by a married woman.

But it is insisted, by counsel for the appellant, that the sale of the land of Benjamin Dawson, inherited by his heirs, was by the consent of Agnes Dawson, a person *sui juris,* and that the sale worked an absolute conversion.

The original record, except the decrees rendered in the suit for partition, has been lost or destroyed. We can, therefore, know but little of the particulars. It is sufficient to say, that there is nothing to show that she did consent. In fact, she did not bring the suit; it was brought by another of the heirs, and she was thus brought into court, it may have been, against her consent. Of this we have no means of judging. But suppose she had consented, her consent could only be taken as extending to the only practicable way of having partition of the land inherited by her and the other heirs. Moreover, there could have been no valid consent amounting to an agreement to sell and convert real estate into personalty, because one of the heirs was at the time of the sale an infant, incapable of consenting. We are bound, therefore, to presume that the depositions refer-

red to in the decree for sale were not mere affidavits, as contended by counsel for the appellant, but were depositions, in fact, required by the court before it would compel this mode of partition of real estate, a mode authorized by statute only when partition in kind cannot be conveniently effected, or is not practicable. In no view has Agnes Dawson, while *sole*, or since her marriage, done any act tending to convert into personalty the land, or her share in the land, here in dispute, which she inherited from her father, Benjamin Dawson. Nor will a court of equity favor a construction that directs the proceeds of the real estate of a married woman, under its control, away from its original source, but will prefer the blood relations, whose ancestor acquired the land, to a mere stranger who intermarries with an heir and begot no issue to inherit.

It was aptly remarked, in argument by counsel for the appellees, that from the earliest time, the common law, viewing with peculiar jealousy the alienation of land, threw around it certain incidents often highly artificial and burthensome, but the impress of which yet remains apparent in the body of our jurisprudence, * * *, &c. It took centuries to change the method of holding and parting with the freehold, even when the owner desired it, and that sanctity of the vested rights in land led the courts to give to its proceeds, when converted by the *vis superior*, the impress of realty. When the courts found it necessary to convert real estate into its representative, the law * * * * left it ultimately to the holder to designate how he would regard the proceeds; and when for any reason he was incapable of taking possession and converting the proceeds as he chose, they were held by the court subject to all the rights and incidents of realty." That this was done ever since the statute gave the right to courts of equity to make partition by sale seems clear.

From a very early period courts of equity in England had concurrent jurisdiction with courts of common law to make partition *in kind* of land. The power of compelling partition

Opinion.

by sale, when partition in kind was impracticable, came by statute at a much later period. And we find, as a rule, that when the sale was made, and the person entitled was under disabilities, courts of equity gave the impress of realty to the proceeds *before any statute* requiring them to do was passed. Thus, independent of any statute, the right was asserted in equity to hold the proceeds of land sold for partition, with all the privileges and burthens incident to real estate, until some act of a party *sui juris* made the conversion. This is fully discussed and illustrated in *Forman* v. *Marsh*, 11 N. Y. 544, and *Horton* v. *McCoy*, 47 N. Y. 21.

Such is the inherent power of courts of equity; and a long line of English authorities might be cited to the effect that where land has been sold, not by voluntary negotiation, but by the compulsory proceedings authorized by statute, and the money paid into court, it continues to be real estate until it is taken out by some person having the right to elect to treat it as money, that is, by some person *sui juris*, who is the unfettered owner.

It only remains to take a very brief view of our own legislation upon the subject. It will be found that our legislature has yielded gradually and with evident reluctance to compulsory partition by sale. By section 20, chapter 96, of 1st Rev. Code, a sale was permitted only in case of two or more heirs, any one of whom should be an infant, *feme covert*, *non compos*, or beyond sea, and then only when the interest of each heir should not exceed in value $300. This indicated very clearly that the legislative policy was opposed to the grant of power to the courts to compel partition by sale, except when the shares were very small, thus guarding the principle before referred to, that land shall move with the *blood* of him in whose right it was acquired.

Necessity brought about the provision contained in section 2, chapter 124, Code 1849, authorising a court of equity to make sale of land for partition, where partition in kind could not be

conveniently made, or where the interests of the parties would be promoted by a sale. Had the act stopped here, there might have been a doubt as to how the proceeds of such compulsory sale should be distributed; and had it been the purpose of the legislature that the proceeds of such sale should be treated as personalty, nothing would have been easier or more natural than to say so. But the legislature did not say so. On the contrary, it provided in the same section that the court should distribute the proceeds of sale "according to the respective rights of those entitled." It could not have been intended, as insisted by appellant's counsel, that the words quoted mean nothing more than that the *proceeds* should be paid over to the parties entitled in the proportion to which they would have been entitled. If such was the meaning, the language employed was entirely useless, for the obvious reason that no court could in any case undertake to distribute a fund upon any other basis than as the parties were entitled. The language employed had quite another meaning; it meant that the court was called upon to make partition of land in that—the only way in which partition was practicable; that the rights of the parties were to have their respective interests in land turned over to them in that way; it might be for life as in case of a widow, in fee as in case of an heir *sui juris*, yet in the same right as if the land had been actually delivered to each party entitled, with the benefit and burthens incident thereto.

But, it is insisted on behalf of the appellant, that section 12 of chapter 128 of the Code of 1849, should be read in connection with said section 2 of chapter 124, to sustain the inference attempted to be drawn from the two sections there read, that, inasmuch as "married women" are not mentioned in said section 12 of chapter 128, therefore the proceeds of the sale of their lands are not stamped with the impress of realty. We are clearly of opinion that this contention is not well founded.

Said section 12 of chapter 128 is in reference to the lands of infants and insane persons, as well as to lands sold under chap-

ter 124; and provides that whatever is received for the sale of the lands of infants or insane persons, under that chapter [128] or under chapter 124, for the real estate of an infant or insane person, or so much thereof as remains at his death, intestate, shall, if he continue till his death incapable of making a will, pass to those who would have been entitled to the land if it had not been so sold or divided.

Now the reason why the proceeds of the sale of the lands of married women were not included in § 12 of ch. 128, is obvious. By § 2 of ch. 124, the proceeds were required to be distributed according to the *rights* of the parties. It must be supposed that in framing § 2 of ch. 124, the legislature had in mind the state of the law as long settled in courts of equity in respect to the estates of married women under the control of a court of equity. For centuries courts of equity had exercised the inherent right to attach to the property of a married woman, under their control, the wife's equity, and to guard the proceeds of her maiden land whenever it became necessary to invoke the aid of equity, by either settling it upon her, or refusing the control of it to her husband until he gave security or made a settlement himself upon her. 2 Story's Eq. Jur. § 1408, *et seq.* What was the rule then is the rule now. Freeman on Co-tenancy and Partition, § 549. Sale for the purpose of partition was authorized by statute to be enforced by courts of equity, and for that reason it was not necessary to provide by statute what it was the peculiar province of equity to do independent of statute, in respect to the estates of married women. This view is borne out by legislative action subsequent to 1849. In 1866, § 12 of ch. 128 was amended by inserting the words " or a married woman," and at the same time so amended § 2 of ch. 124, the partition law, as to provide that when the share of a married woman should exceed $300, security should be taken to protect her interest. Subsequently (see Acts 1869–70, p. 578), the partition law was again amended and re-enacted, by dropping out the words, " or mar-

ried woman." Clearly, for the reason already given, these words were stricken out of the partition law, simply because they were useless. On the contrary, the reason for inserting the provision in § 12 of ch. 128, as to the sale of the lands of infants and insane persons, rested on entirely different grounds. Their lands would pass into the hands of guardians and committees, who might infer that they had the right to sell and convert real estate into personalty. Out of abundant caution the legislature guarded against the exercise of any such power by the provision in § 12 of ch. 128. It is difficult to conceive any other plausible reason for so doing.

It is useless to pursue the subject further. Agnes C. Dawson, with the other heirs of Benjamin Dawson, one of whom was an infant, inherited land. She never, while she was *sole*, or after her marriage with the appellant, did any act tending to a conversion of the fund in question into personalty. She bore no child to the appellant, and died leaving her husband a stranger in blood and interest to the fund in controversy, stamped as it is with the character of real estate, and belongs by law and reason to the next of kin, to the exclusion of her surviving husband, the appellant.

For these reasons the decree of the court below must be affirmed, with costs to the appellees.

DECREE AFFIRMED.