ELIZABETH B. BRYSON, ET AL. v. IRBY TURNBULL, EX'R., ET AL.

January 26, 1953.

Record No. 4011.

Present, All the Justices.

The opinion states the case.

*Tucker, Mays, Cabell & Moore, Y. Melvin Hodges, William J. McDowell,* for appellants.

*Meredith C. Dortch, Morton G. Goode, George R. Humrickhouse, John Y. Hutcheson, Edwin A. Crowder, Irby Turnbull, Williams, Mullen, Pollard & Rogers,* for appellees.

WHITTLE, J., delivered the opinion of the court.

This case is before us upon appeal from a decree of the Circuit Court of Mecklenburg county, entered on November 28, 1951, in the consolidated causes pending there under the style of L. W. Wimbish's Executor v. Charlotte Wimbish, *et al.,* in which decree the court adjudicated the claims of the parties to the estate of Emmet T. Boyd, deceased.

Emmet Townes Boyd, the widow of John B. Boyd, executed her will on December 22, 1938. She was seventy-three years of age at the time and had no children. She owned three adjoining tracts of land designated as follows: the Harris tract, containing 720 acres; the Burnette tract, containing 50 acres, and the Cuscowilla tract, containing 1052.1 acres. The three tracts constituted the plantation upon which Mrs. Boyd and her husband lived during their married life. The mansion house was located on the Cuscowilla tract which had been inherited by Mrs. Boyd from her direct ascendants. The two other tracts, together with some $25,000 in cash and securities, had been devised to her by her husband. She also owned a two-thirds interest in a parcel of land known as the Dr. Townes tract.

On the date of her will Mrs. Boyd also owned considerable tangible personal property in addition to $34,293.26 in cash and securities which included the $25,000 bequeathed to her under her husband's will.

After making numerous bequests of specific personal items and several monetary legacies totalling $7,000, Mrs. Boyd disposed of her estate as follows:

"To my faithful servants, Tom and Lucy Jones, I leave in fee simple that tract of land known as the 'Burnette Place', which was purchased by my husband.

"To Lizzie Bryson, Elizabeth Reynolds and Henrietta Dalby, I leave in fee simple all that tract of land known as the Harris Place which was purchased by my husband.

"To the above mentioned Lizzie Bryson, Elizabeth Reynolds and Henrietta Dalby, I leave the balance of my money of whatever kind, cash, stock, bonds, choses in action, after the payment of other bequests and charges against my estate.

"All the rest of my property not otherwise disposed of, real, personal, or mixed, I leave to my five nieces and nephews, Charlotte Wimbish, Emmet O'Halloran, Nannie Sullivan, Townes Wimbish, and Claiborne Wimbish."

Lizzie Bryson was a half-sister of Mrs. Boyd's husband, and Elizabeth Reynolds and Henrietta Dalby were his nieces. The three were her husband's next of kin. Charlotte Wimbish, Emmet O'Halloran, Nannie Sullivan, Townes Wimbish, and Claiborne Wimbish, to whom she left the rest of her estate, including the Cuscowilla tract, were five of her seven then-living nieces and nephews of the Townes blood, and were her next of kin.

Shortly after the will was made, Irby Turnbull was appointed guardian for Mrs. Boyd upon the ground of her physical disability. Mrs. Boyd later became mentally incapacitated and Turnbull continued to serve as guardian until her death on April 29, 1950, when he qualified as executor under her will.

In December, 1944, the Federal flood control plan, then known as the Buggs Island project, was approved by the Congress and it became apparent that a considerable portion of Mrs. Boyd's lands would be inundated. To protect his ward's interest, the guardian instituted a chancery suit seeking permission of the court to sell the standing timber on the affected lands. Under authority of a decree entered July 22, 1946, the timber on the

Harris and Burnette tracts was sold for $1,000, and the timber on the Cuscowilla tract for $39,300. The net proceeds from these sales were invested by the court and are held by it.

Later the United States government filed a condemnation suit in the Federal District Court seeking to acquire the Burnette tract and portions of the Harris and Cuscowilla tracts. Compensation for the land to be taken was agreed upon between the government and the guardian, and upon the latter's recommendation to the Circuit Court of Mecklenburg county the guardian was authorized, by decree entered in the chancery suit mentioned above, to accept the sum of $44,000, the net of which is now held by that court.

During the guardianship, in a suit by Sallie Goode Morton, seeking partition, Mrs. Boyd's two-thirds interest in the Dr. Townes tract was sold under a decree of court entered at the August, 1944, term. Mrs. Boyd's share of $3,573.44 was paid to the guardian, who invested $3,500 in government bonds and later sold $2,000 of the bonds and deposited the proceeds in his fiduciary account. Thus at Mrs. Boyd's death $1,500 of this investment remained in bonds.

At the time of Mrs. Boyd's death her estate therefore consisted of: tangible personal property appraised at $3,589; cash and securities appraised at $14,673.17; net proceeds from sale of timber $36,757.92; net proceeds from sale of condemned land $41,355.90; 26.5 acres of the original Harris tract; and 202.1 acres of the original Cuscowilla property, which was later disposed of in the suit for $35,500.

Lizzie Bryson, Elizabeth Reynolds, Henrietta Dalby, Charlotte Wimbish, Claiborne Wimbish and Emmet O'Halloran survived the testatrix, but Nannie Sullivan and Townes Wimbish predeceased her without issue.

The chancery suit in which the guardian sold the timber and settled the condemnation case was consolidated with another chancery suit brought for the purpose of construing the will. In the consolidated suit a decree was entered referring the cause to Charles J. Faulkner, commissioner in chancery. The principal issue submitted was the determination of the parties entitled to the proceeds from the sale of timber and the land taken by condemnation.

It was conceded that Mrs. Boyd had testamentary capacity on December 22, 1938, when she made her will. But it was

agreed by stipulation of all parties to the litigation that "* * * for sometime before the suit to sell the land and timber and the condemnation proceedings taking some of the property under consideration were filed and continuously since and until her death she was mentally incapable to make, change or revoke a will, * * *."

Commissioner Faulkner filed a carefully considered report in which he held that the proceeds from the timber and lands should pass under the will as real estate, as if the same had not been disposed of. The court entered a decree on November 28, 1951, confirming the commissioner's report and adjudicating the principles of the cause. Appellants, Elizabeth Bryson, Elizabeth Reynolds and Henrietta Dalby, excepted to the report and the decree confirming same, and we granted them an appeal.

Appellants contend that the will is "* * * to speak and take effect as if it had been executed immediately before the death of the testator, unless a contrary intention shall appear by will." 1950 Code of Va., § 64-62. They argue that at the time of Mrs. Boyd's death the real estate had already been changed into personalty and should be treated as such.

Appellees, Charlotte Wimbish, Claiborne Wimbish and Emmet O'Halloran, contend that there is no doubt about testatrix's meaning, that "her will, in so many words, leaves the intangible personalty and the Harris tract to appellants and 'what is not otherwise disposed of' to appellees by way of a residuary gift; and it contains no provision indicating an intent contrary to the presumption created by the statute."

Appellants further say, "It necessarily follows that the money and bonds in court at the time of death * * * pass to appellants, unless there be some positive rule of law, principle of equity, or statute which requires that they be given special treatment under the circumstances of this case."

Appellees contend to the contrary, that the sale of the timber and the lands was brought about by paramount authority at a time when the testatrix was incapable of dealing with her property, and at a time when she was incapable of changing or revoking her will, and for these reasons the proceeds of the sales are to be considered as real estate.

While appellants list several assignments of error, they state in their brief that the questions involved are:

"A. Are the proceeds from the sale of timber, the condem-

nation, and the partition to be considered real or personal property for the purpose of devolution under the will?

"B. If such proceeds or any part thereof are not to be considered as personal property, to whom should they be payable?"

It is suggested by appellants that the question here involved is one of first impression in this Commonwealth.

This case does not present the question of the construction of a will, to ascertain who takes the property devised. It rather requires the treatment of the legal and equitable consequences following the dealings with real estate of an incompetent.

The will of Mrs. Boyd, as written, is clear. It discloses that she desired such of her property as was derived from her husband to go to his next of kin, and she desired her own property to go to her next of kin. This is shown by reading the portion of the will quoted above. Clearly, Mrs. Boyd never intended for appellants, who were her husband's next of kin, to have the proceeds from the forced sale of Cuscowilla or the timber taken therefrom, for she had left this tract to five of her seven nieces and nephews.

Prior to the forced sale of any timber or land Mrs. Boyd became mentally incompetent to deal with her property. She was not competent to make a change in her real estate holdings. and she was not competent to revoke or modify her will. Under these circumstances the intent she exercised when she made her will was never changed. The opportunity to change her intentions was denied her. The intervention of mental incompetency demands this conclusion.

This accords with the prevailing rule in equity that those dealing with the estate of an insane person cannot so change the nature of property as would change the devolution of the same upon death. In Pomeroy's Equity Jurisprudence, Fifth Edition, Volume 4, section 1167, in discussing the general principles applicable to the conversion of property, it is stated:

"There is another phase of the doctrine of conversion of great importance in England, and a brief summary of the decisions may be useful under analogous circumstances in this country. This has been happily denominated conversion by paramount authority, and includes the particular instances of compulsory purchases and taking of land by railway companies, and others possessing such statutory authority, and sales of land

by order of court for the purpose of settling the estates of infants and lunatics, or of partition, or of paying debts, and the like. In this aspect of the doctrine, the question to be examined is the exact converse of that which arises under the ordinary form of conversion and which has been discussed in the foregoing paragraphs. The question then was, is the property though not actually converted to be treated as converted? The question now presents itself, is the property, although *de facto* converted, to be treated to any extent as *not* converted. The special rules which contain the answers to this question are placed in the foot note. Where land is purchased or taken under compulsory powers conferred by statute, and the owner is *sui juris,* a conversion is effected; the purchase money, although not yet actually paid, becomes to all intents personal property; but if the owner is an infant or a lunatic, or the land is in settlement, the purchase money remains land; there is no conversion.

"Where land is sold by order of the court for any purpose, it is a fixed principle, upon which the court always proceeds, that the character of the property should be changed only so far as may be necessary to accomplish the particular purpose * * *".

See also 6 M. J., Equitable Conversion, § 8, pages 800, 801; 18 C.J.S., Conversion, § 40, page 74; 19 Am. Jur., Equitable Conversion, § 23, page 19; Tiffany on Real Property, 3rd Ed., Sec. 306; Story's Eq. Jur., Section 1101.

In elaboration of the above quoted text the author points out that where land is taken by other than voluntary negotiations, *i. e.,* where it is taken by compulsory proceedings authorized by law, the money paid into court continues to be real estate until its nature is changed by a person *sui juris,* having a right to elect to treat it as money. If the owner is an infant or lunatic the money necessarily retains the character of real estate. *McCoy* v. *Ferguson,* 249 Ky. 334, 60 S. W. 2d 931, 90 A. L. R. 891; *McClain* v. *McClain,* 151 Ky. 356, 151 S. W. 926, Ann. Cas. 1915A 155; *Brown* v. *Wilson,* 174 N. C. 636, 94 S. E. 416; *Badgett* v. *Lones,* 154 Tenn. 476, 290 S. W. 12; *Hopkinson* v. *Richardson,* (1913), 1 Ch. (Eng.) 284; *Dixie* v. *Wright,* 32 Beav. 662, 55 Eng. Rep. 260; *Ex Parte Hardy,* 30 Beav. 206, 54 Eng. Reprint 867; and the annotation in 90 A. L. R. 899-909.

While the exact factual situation we have before us has never

been decided in Virginia, the guiding principles have been established by this court, and we are in accord with the principles just stated.

In *Vaughan* v. *Jones*, 23 Gratt. (64 Va.) 444, decided in 1873, the real estate of an infant mother had been sold under a decree of court. The mother died in childbirth leaving the child who survived her but a few hours. The husband (father) survived the child. It was held that the proceeds from the real estate descended, not to the husband as personal estate, but as real estate to the child, subject to the husband's life estate; that upon the death of the child the proceeds of sale passed as real estate to the heirs of the child on the mother's side. The court said:

"It is an established principle of courts of equity * * * not to suffer the real estate of infants to be changed into personal, nor personal into real estate. Upon this principle the legislature of this State has directed, in the sale of infants' real estate under the authority of courts of chancery, that if the infant dies under twenty-one years, the proceeds of the sale shall be considered as real estate, and shall pass to such person as would have been entitled if it had not been sold. * * *

"It is evident that section 21 of chapter 108 was inserted to carry out the principle declared in a previous section, that the sale could only be made within the restriction that the rights of no person should be violated thereby, and also in accordance with the established principle of equity, not to suffer the real estate of an infant to be changed into personal, &c. * * * It was evidently the design of the legislature, in framing this statute, that neither the rights of the infant, as incident to his real estate, and the well established principles of equity in relation thereto, nor the rights of those who would be entitled to the estate, upon the death of the infant under twenty-one years of age, should be altered by the sale of his real estate. Indeed, it would not have been proper, if competent to the legislature, to have authorized a court to deprive the infant of a vested beneficial right incident to his ownership of real estate, he being incapable of assenting thereto, or which would have diverted (the statute uses stronger language), 'violated' the rights of those who were entitled to the estate at the death of the infant under disability. * * * An infant or lunatic cannot elect, and therefore cannot change the character impressed upon the property. But it must retain the character impressed upon it by the last absolute owner, until that

character is changed by some one having like power over it. * * *''

While the *Vaughan Case* dealt with the proceeds derived from the sale of infants' lands, its holding, by logical reasoning, applies with equal force to the proceeds derived from the sale of lands owned by a mentally incompetent person. The principle upon which the case rests is the equitable doctrine that upon the involuntary sale, under a judicial decree, of the land of an incompetent person, incapable of dealing with the real estate, the proceeds should be impressed with the character of the land sold and should pass as such at death if the disabilities have not been removed.

*Turner* v. *Dawson*, (1885), 80 Va. 841, is additional authority for this proposition. In that case the court commented upon the statute relating to the sale of lands of infants and insane persons and stated that it had been enacted out of an abundance of caution to guard against guardians and committees who might infer that they could sell and convert realty into personalty.

■ The statutory provision referred to in the *Vaughan Case* is now § 8-689 of the Code, and at the time of Mrs. Boyd's death read:

''*What proceeds of sale to pass as real estate.*—What may be received under the preceding provisions of this article or under article 3 of this chapter, for the real estate of an infant, insane, or ex-service person, sold or divided, or so much thereof as may remain at his or her death intestate, shall, if he or she continue until death incapable from any cause of making a will, pass to those who would have been entitled to the land if it had not been sold or divided.''

Appellants, in an effort to distinguish the *Vaughan Case,* have directed attention to the word ''intestate'' appearing in this statute. They argue that the statute is not applicable where the infant or insane person has left a will. They contend that where there is a will, as in this instance, there is no intestacy, and the sale of the land works an absolute conversion, causing the proceeds to pass as personalty.

. However, in *Vaughan* v. *Jones, supra,* the court met this argument and held that the statutory scheme indicated that no conversion occurs upon the sale of an incompetent's land during the period of disability. Specifically considering the word ''intestate'', as used in the statute, the court concluded that it

was mere surplusage, saying: "If it (intestate) was unnecessary, it may be rejected as surplusage, which we may rather do than reject express and important provisions of the statute." (23 Gratt. (64 Va.), at page 452)

Nor is section 8-689 of the Code the only section showing that the legislature has been zealous to protect estates of infants and mentally incompetent persons. By a general scheme of legislation it has carefully defined the powers of guardians and committees and has dealt with such in keeping with legal and equitable principles.

Section 37-147 of the Code provides that a committee shall take possession of his ward's estate, and section 37-150 directs that he "shall take care of and preserve * * * and manage it to the best advantage. He shall apply the personal estate, or so much as may be necessary, to the payment of the debts of his ward, and the rents and profits of the residue of his estate, real and personal, and the residue of the personal estate, or so much as may be necessary, to the maintenance of such person and of his family, if any."

Section 37-151 provides: "The committee shall surrender the ward's estate, or so much as he may be accountable for, to the ward, if he shall be restored, or the real estate to his heirs *or devisees,* and the personal estate to his executors or administrators, in case of his death without having been restored, * * *." (Italics supplied)

This section recognizes that an incompetent may have made a will prior to his disability, and it imposes the duty upon the committee to surrender such estate to the devisees named therein if the ward dies before regaining sanity.

The ownership of property of an insane person remains in him. Only the management of the property is transferred to his committee who has no authority over the same except to manage and care for it during the disability of the incompetent. *Shands* v. *Shands,* 175 Va. 156, 7 S. E. 2d 112. See also *Lake* v *Hope,* 116 Va. 687, 696, 82 S. E. 738.

Since the ownership of the property remains in the incompetent, where it has been disposed of by a valid will, prior to incompetency, as in the instant case, neither the committee nor the court can rewrite the will or change the beneficiaries named

therein. The form of the property may be changed for certain purposes but the will cannot be revoked or modified.

■ Especially illuminating are the statutes enacted concerning the sale of lands owned by infants and incompetents. Code, sections 8-674 through 8-689.3 deal with such sales under the supervision of courts of chancery. It is evident from these sections that the rights of the incapacitated have been safeguarded. The character of the property cannot be changed except to the extent necessary to carry out the objects demanded. For all other purposes the proceeds of sale retain the character of the property sold until the disabled person becomes competent to manage his own affairs. *Somers* v. *Godwin,* 182 Va. 144, 27 S. E. 2d 909.

Section 8-676 requires that all persons interested in the subject matter, including the heirs and distributees of the infant or insane person if they were dead, be made parties to any suit brought to sell their land. The reason for this requirement is stated in *Gee* v. *McCormick,* 142 Va. 173, 128 S. E. 541, and *Newman* v. *Light,* 152 Va. 760, 148 S. E. 818.

In the *Gee Case* the requirement that the heirs of an infant whose land was being sold, be made parties, was stated to be twofold: ''First, the presumed affection of such heirs for the infants; and second, their personal contingent interest in the land sought to be sold. It is a natural conclusion that those who may become the owners of the land or its proceeds will see that the same is not sacrificed by a guardian who is recreant to the trust imposed upon him.'' (142 Va., at page 185)

In the *Newman Case* the court quotes from Lile's Equity Pleading and Practice, (1919 Edition), at page 159:

''Since the infant is incapable of making a will of realty before majority and the insane person is wholly *incapax testandi,* the prospective heirs and distributees have a special (if not anxious) interest in maintaining the integrity of the estate. It is eminently proper, therefore, for the safeguarding of their own interests, as well as those of the infant or insane person, that these kindred should be made parties and given an opportunity to be heard.'' (152 Va., at page 769)

Section 8-682 provides that before a sale may be ordered it must not only be clearly shown that the interest of the infant or insane person would be promoted thereby but the court must

be of the opinion that the rights of no person will be violated. Moreover, these special funds are paid into court. They are not to be intermingled with the personal estate under the control of the committee or guardian. Code, § 8-685; *Pope* v. *Prince,* 105 Va. 209, 52 S. E. 1009. Such funds must be invested under the court's direction for the benefit of those entitled to the estate.

Section 8-687 provides that the wife of the infant or insane person may have her inchoate right of dower transferred to the proceeds derived from the sale of the incompetent's land —thus showing that the proceeds from the sale are to be regarded as real estate.

Then follows section 8-689 which provides that upon the death of the incompetent the proceeds from the sale of the land shall pass to those who would have been entitled to the land had same not been sold or divided. Thus the legislative intent is made clear; *viz.,* the character and nature of an incompetent's land is not to be changed except to the extent required, and when the land is sold the proceeds received shall be impressed with the character of the land.

The legislative intent thus shown by the general scheme of enactments is fully in accord with and reflects the just principle of equity which controls our decision. Moreover, the weight of authority is in accord with the result here reached. See 90 A. L. R. 897, 913, where the following cases are cited: *National Bd.* v. *Fry,* 293 Mo. 399, 239 S. W. 519; *Lamkin* v. *Kaiser,* (1923 Mo. App.), 256 S. W. 558; *Brandreth* v. *Brandreth,* 54 Misc. 158, 103 N. Y. S. 1074; *In Re Garlick,* 96 Misc. 653, 161 N. Y. Supp. 1113; *Snedeker* v. *Ellis,* 136 Misc. 607, 241 N. Y. Supp. 563; *Midland Counties R. Co.* v. *Oswin,* (1844), 1 Colly. Ch. Cas. 74, 63 Eng. Rep. 327. See also *Lewis* v. *Hill,* 317 Ill. App. 531, 47 N. E. 2d 127, 387 Ill. 542, 56 N. E. 2d 619.

Lastly, appellants ask: "If such proceeds * * * are not to be considered as personal property, to whom should they be payable?" Their purpose is to have the proceeds from the land and timber share with the personal estate in the payment of Mrs. Boyd's expenses during her incompetency. They argue that it is unfair to charge the personal estate with these expenses and relieve the proceeds from the real estate of all such charges. They cite the cases of *Buder* v. *Stocke,* (1938), 343 Mo. 506, 121 S. W. 2d 852, and *In Re Larking,* (1887), 37 Ch.

Div. 310, 57 L. J. Ch. N. S. 282. These cases deal with estates in which personal property has been used to enhance the value of real property. It is not claimed that such were the facts in the instant case.

Appellants are not specific legatees. They are residuary beneficiaries who share in what is left of the testatrix's intangibles after the payment of certain specific legacies and "charges against my estate".

The personal estate rather than the real estate is to be used for support and maintenance and the payment of debts. Section 37-150 of the Code makes it mandatory upon the committee of an insane person to resort to the personalty for the support and maintenance of his ward. There is no merit in this request for exoneration.

We find no error in the decree appealed from and the same is

*Affirmed.*