## Richmond

DANIEL J. LAYTON, GUARDIAN ETC., ET AL. v. BASCOM S. PRIBBLE, JR., COMMITTEE.

December 1, 1958.

Record No. 4831.

Present, All the Justices.

The opinion states the case.

*Stuart G. Christian* and *Harry B. F. Franklin* (*Christian, Marks, Scott & Spicer; Franklin & Rawlings*, on brief), for the appellants.

*Walter E. Rogers* (*Williams, Mullen, Pollard & Rogers*, on brief), for the appellee.

BUCHANAN, J., delivered the opinion of the court.

This is an appeal from an order denying and dismissing the petition of Daniel J. Layton, the Delaware guardian of Rose Neel Henderson, filed under § 26-60 of the Code for the transfer to him of the personal estate of his ward in the hands of her Virginia committee, Bascom S. Pribble, Jr.

Section 37-140 of the Code provides for the appointment of a committee or guardian of the "person or property" of one who has become mentally or physically incapable of taking care of his person or properly handling his estate, such committee or guardian to have the same rights and duties as given to committees appointed for the mentally ill under other sections of the Code. Pursuant to this section and upon the motion of Miss Henderson, then a resident of Stafford county, Virginia, the court by order entered May 19, 1954, appointed Bascom S. Pribble, Jr., as committee of Miss Henderson's estate.

Thereafter the committee filed a petition alleging that Caroline Henderson, sister of Rose, had removed Rose, contrary to the committee's directions, from this State and refused to return her, and praying for an order directing her return. Pursuant thereto the court entered an order on February 7, 1955, directing Caroline to return Rose to her home in Stafford county and directing that the committee continue to have complete control of her property as well as her person. Rose was then living with her sister Caroline in Georgetown, Delaware, and this order was not complied with.

On February 11, 1956, Daniel J. Layton, as Delaware guardian,

and Rose Neel Henderson, referred to herein as complainants, filed the petition first mentioned praying that the personal property of Rose be transferred to the Delaware guardian. It alleged that in December 1954 Rose decided to make her home with her sister Caroline in Georgetown, Delaware, and accordingly took up her abode and became legally domiciled there; that because of her advanced age and state of health it would be highly detrimental for her to return to her home on her farm in Stafford county. Exhibited with the petition was a certificate by the State psychiatrist of Delaware that he had examined Miss Henderson on March 25, 1955, and found her rational and mentally competent to decide where and with whom she wished to reside. Also exhibited was a letter written by Dr. Scott, of Fredericksburg, Virginia, to the committee, stating that at the committee's request he had examined Rose in Georgetown, Delaware, on October 12, 1955, found her in excellent physical health for her age of 75 years, and showing every sign of being happy and well cared for; that he found her totally incapable mentally to conduct her business affairs, but sufficiently competent to be able to state her preference for companionship "and in this she has consistently chosen her sister, Caroline"; that she became confused and made contradictory answers to questions about her present residence and future plans, but "one thing about which she was consistent was that she is happy and wishes to continue living with her Sister Caroline."

The petition further alleged that upon a petition duly filed in the Orphans' court of Sussex county, Delaware, said Daniel J. Layton, of Georgetown, Delaware, was appointed guardian of the property of Rose Neel Henderson, and duly authenticated copies showing that proceeding were exhibited with the petition.

The committee filed his answer to this petition on March 1, 1956, stating that Rose Neel Henderson at the time of his appointment resided in Stafford county, Virginia, and there owned a farm of 223.3 acres with farm equipment thereon and a large amount of corporate stock and other intangibles. The corporate stock was some 4800 shares in the Riegel Paper Corporation, upon which the committee had received dividends of $8,491.80 to December 5, 1955. The answer alleged that by undue influence Caroline had obtained from Rose, in August 1952, a deed for the farm and an assignment of the stock, and as a result of a compromise brought about by the committee, Caroline had reconveyed this property to

Rose, taking a deed of trust on the farm and 1000 shares of the stock to secure payment of $25,000 by Rose to her; that after his appointment as committee, Caroline had interfered with his management of the estate, had taken Rose out of this State, and that the Delaware court was without jurisdiction to appoint a guardian for Rose.

Afterwards, on the petition of the committee, who had received notice of the purpose of the guardian to take depositions in Delaware, an order was entered on May 11, 1956, requiring Rose to appear and to testify orally before the court at such times as might be fixed and stating that any depositions would be disregarded whether taken in Delaware or elsewhere. That order was not obeyed because Rose was physically and mentally unable to comply with it. There were other proceedings in the matter with which we need not be now concerned.

Thereafter depositions were taken on behalf of the complainants in Georgetown, Delaware, and on behalf of the defendant in Fredericksburg, Virginia, and on September 9, 1957, the court entered the decree appealed from denying and dismissing the complainants' petition for reasons stated in two written opinions. These reasons were that Miss Henderson had no property in Delaware, and, hence, under the Delaware statute the Delaware court had no jurisdiction to appoint a guardian for her or make any other findings; that its order was therefore void and the guardian had no standing before the court in the capacity in which he had sued; further, that Miss Henderson was incapable of joining in the petition in person, and that she had not voluntarily changed her residence from Virginia to Delaware, but such change had been made under the undue influence of her sister Caroline.

The Delaware guardian was appointed under Title 12, § 3954 of the Code of that State, providing for the appointment of a guardian for the property of a resident of that State who by reason of advanced age or mental infirmity or physical incapacity is unable to manage and care for his property. The petition for the appointment was filed by Miss Henderson in January 1956. It alleged, *inter alia*, that she was born December 21, 1880; that she had surrendered her domicile in Virginia on December 8, 1954, and then became domiciled in and a legal resident of Georgetown, in Sussex county, where she was residing with her sister Caroline, who was her nearest relative. At a hearing on this petition Miss Henderson was examined personally by the court and other witnesses were heard, and the court entered

its order finding that she was legally competent to change her domicile and that her legal place of residence was in Georgetown, Sussex county, Delaware; that a guardian of her property should be appointed and Daniel J. Layton was accordingly appointed and required to give bond in the penalty of $500, subject to be increased when he received Miss Henderson's property.

The jurisdiction of the Delaware court to make the appointment is clear. If it was essential to jurisdiction that Miss Henderson own property in Delaware, which the statute did not in terms require, there was no evidence that she did not, and it is to be presumed that the court acted within its jurisdiction. 11 Mich. Jur., Judgments and Decrees, § 232, p. 289. Moreover, there was uncontradicted evidence that she had a bank account in Georgetown. Also, she was the owner of the corporate stock referred to, and under the common law maxim of *mobilia sequuntur personam* that ownership followed her to the place of her domicile. *Commonwealth* v. *Morris*, 196 Va. 868, 872, 86 S. E. 2d 135, 138; 51 Am. Jur., Taxation, § 462, p. 474. The ownership of her property remained in her when the defendant was appointed committee; its management alone was transferred to him "for preservation and such wise expenditure as may be most beneficial to the incompetent owner." *Shands* v. *Shands*, 175 Va. 156, 160, 7 S. E. 2d 112, 113; *Bryson* v. *Turnbull*, 194 Va. 528, 537, 74 S. E. 2d 180, 186. "The primary object of the statutes dealing with mentally or physically incapacitated persons is the management of the property for their benefit." *Gilmer* v. *Brown*, 186 Va. 630, 639, 44 S. E. 2d 16, 20.

It is equally clear that Miss Henderson left Virginia and went to Georgetown with the intention of making her home there with her sister and it thereupon became her domicile. "Domicile is residence at a particular place, accompanied by intention to remain there for an unlimited time." *State-Planters Bank* v. *Commonwealth*, 174 Va. 289, 295, 6 S. E. 2d 629, 631.

Dr. Scott, who examined Miss Henderson in 1955, ten months after she had gone to Georgetown, considered her totally incompetent mentally to conduct her business affairs, but he said the one thing she was consistent about was that she was happy and wished to continue living with her sister Caroline. Less than four months after she had gone to Delaware she was examined by the State psychiatrist of Delaware, who found her mentally competent to decide where and with whom she wished to reside. He also examined

her in November 1956 when the depositions were taken in Georgetown, and testified that she was then more confused but that she stated to him, "I don't care where I go, as long as I am with sister. I prefer to live with her right here."

The Delaware guardian, Judge Layton, a former Chief Justice of Delaware, was a friend of the Henderson family in Georgetown and had known these sisters for more than fifty years. He testified to the careful investigation he had made to satisfy himself that Rose was a legal resident of Sussex county. He accepted the guardianship reluctantly and expressed intention to resign if and when the funds were transferred and try to have a bank appointed. Rose had said to him repeatedly that she would like to live on her farm in Virginia but knew it was impossible because she could not ask Caroline to give up the new home she had built in Georgetown and move down to the farm. Caroline had never charged Rose anything for board or lodging since they had lived together. The family doctor in Georgetown testified that Rose had stated to him the morning he testified that she was very happy with her sister and wished to remain with her in Georgetown as long as she lived. Neighbors and friends in Georgetown gave similar testimony.

Dr. Scott, called by the defendant, testified that Miss Henderson had been his patient since about 1950 and in June 1954 he had written to Judge Bazile that she was mentally and physically incompetent to handle her affairs. He said she was then senile and when he examined her again in October 1955 there had been a very definite progression of her mental deterioration and she was then completely unable to express her thoughts coherently and did not know where she was on the day he saw her. Two other witnesses also testified. One, Mrs. Proctor, pictured Caroline as "a materialistic, domineering, unkind person," who was interested not in Rose but in her property, which she had schemed to get. She was sure Rose would never have gone to Delaware of her own volition. She knew, she said, that Rose loved Caroline and thought of her as her little sister, but a few minutes later she testified that Rose never did like Caroline. She was very positive, however, that when the committee was appointed in May 1954 Rose "knew exactly what she was doing and exactly what she wanted to do." The other witness, Mrs. James, had nursed Rose prior to her going to Delaware and held a similar though less voluble opinion of Caroline. She did not believe that

Rose ever wanted to go to Delaware. Neither of these witnesses had seen Rose since she went to Delaware in December 1954.

The case is of a childless woman now 78 years old, mentally and physically unable to care for herself or her property, who has left Virginia and gone to live with her sister, who is also her only near relative, in her comfortable home in Georgetown, Delaware, where her family home was. According to those who should know, she is happy there, has so expressed herself to her doctor and friends, and states that that is where she wants to live until she dies. Whatever may be the faults of her sister, the latter has been keeping and caring for her for nearly four years without charge, and if she is unkind to her then those who live near her and see her often would likely know about it and it is not probable that in her mental state she could have simulated a happiness that did not exist. She loved her home in Virginia, she said, but she wanted to live with her sister and she knew that could be done only in her sister's home. These two sisters are the only members left of their family. They are close together in age and it is but natural that now they would want to be close together in life.

The guardian appointed for her property in Delaware is obviously a man of high character and attainments. In addition he lives close by these two sisters in Georgetown and has been a family friend for more than half a century. He has a personal interest in his ward and is so situated as to know her needs and to see that she has the care and comforts required for her health and happiness in her remaining years. No reason is perceived why her personal property should not be transferred as prayed rather than have it handled by a committee in Virginia who could know her needs only second-hand and would have to rely on some local person to apply the funds that he might transmit from time to time.

Section 26-62 of the Code provides that no order of transfer under § 26-60 shall be made until notice be published and bond be given as therein prescribed, nor until the court is satisfied that the transfer will not impair the rights or prejudice the interests of either the ward or any other person. The discretion of the court there implied is a judicial discretion, to be exercised according to the facts and not arbitrarily. The facts here are that the transfer will be in the interest of the incompetent and they suggest no prejudice to the rights of any other person.

After the case was decided but before the final decree was

entered, counsel for the complainants petitioned the court to direct the committee to pay to them out of Miss Henderson's funds the sum of $1,500 on account of their services in preparing the record and a petition for appeal to this court. The court refused to grant the petition. It should have been granted. The services for which the sum was asked were for the benefit of the incompetent and proper to be paid out of her estate.

The decree appealed from is reversed and the case is remanded with direction to enter appropriate decree or decrees directing the committee to pay to complainants' counsel for the purposes stated the sum of $1,500, and directing the committee to pay and deliver to the Delaware guardian all personal property and money of Rose Neel Henderson in the hands of the committee upon a proper settlement of his accounts, and after compliance with the requirements of §§ 26-60 and 26-62 of the Code of Virginia.

*Reversed and remanded.*